FILED
United States Court of Appeals
Tenth Circuit

January 7, 2009

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

CLEMENTE RIOS BRAVO, JR.,

Defendant - Appellant.

No. 08-6014
(D.C. No. 5:07-CR-00130-F-1)
(W.D. Okla.)

---

ORDER AND JUDGMENT[*]

---

Before **TACHA**, **KELLY**, and **McCONNELL**, Circuit Judges.[**]

---

Defendant-Appellant Clemente Rios Bravo, Jr., appeals from his conviction

upon a conditional plea of guilty to possession with intent to distribute in excess

of 100 kilograms of marijuana. 21 U.S.C. § 841(a)(1), (b)(1)(B); R. Docs. 10, 48

at 5 ¶ 8(a), 57. He was sentenced to 51 months' imprisonment followed by five

years' supervised release. R. Doc. 57 at 2-3. He now appeals the denial of his

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

[**] After examining the briefs and the appellate record, this three-judge
panel has determined unanimously that oral argument would not be of material
assistance in the determination of this appeal. See Fed. R. App. P. 34(a); 10th
Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

motion to suppress the marijuana, arguing that the traffic stop and subsequent search violated his Fourth Amendment rights. Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm.

Background

On April 12, 2007, Agent Troy Wall of the Canine Interdiction Unit of the Oklahoma Bureau of Narcotics observed a white Ford Expedition heading eastbound on Interstate 40. Tr. (9/4/2007) 7-8. The agent testified that he had just completed a traffic stop and was preparing to merge into eastbound traffic with his rear emergency lights on. Tr. 8. The agent saw the Expedition approaching from behind at a slow rate of speed, and observed that the driver did not signal when he changed lanes to yield to the agent's emergency vehicle. Tr. 8. According to the agent, the Expedition then made "an exaggerated lane change" back into its original lane, signaling for about 300 feet and then taking another 300 feet to change lanes. Tr. 8. The agent pulled into the eastbound lane of Interstate 40 and followed the vehicle. Tr. 10. As he did so, he checked its registration, discovering that it was registered to Clemente Bravo from Deming, New Mexico. The agent then stopped Mr. Bravo. Tr. 10-11.

When the agent approached the passenger side of the vehicle, he observed a male driver and a female passenger and smelled the "overwhelming" odor of air fresheners. Tr. 11-12. When he examined the insurance and registration

-2-

documents, which were the only items in the glove box, the agent saw that the vehicle had been recently registered. Tr. 13. He also observed that the only luggage in the vehicle was a small blue duffel bag. Tr. 14, 37-38. The agent then had Mr. Bravo exit the vehicle, informed him that he had stopped him because of his unsafe lane change, and had him get into the patrol car as he filled out a warning. Tr. 14-15.

While the agent filled out the paperwork, he engaged Mr. Bravo in conversation about Mr. Bravo's travel plans. Mr. Bravo said that he was going on his honeymoon with his passenger, Ms. Felix, and was headed to Kansas. Tr. 15-16. According to the agent, Mr. Bravo would not tell him which city in Kansas he was headed to, instead telling him that he was going "nowhere in particular" and then talking about both Oklahoma and Kansas. Tr. 16. The agent testified that, while it is normal to be slightly nervous in these circumstances, Mr. Bravo displayed "an extreme form of nervousness"; his hands were trembling, he avoided eye contact, he stammered, and his carotid pulse was abnormal. Tr. 17. Becoming suspicious of Mr. Bravo's story, the agent then returned to the Ford Expedition to talk to the passenger. Tr. 18. According to the agent, Ms. Felix said that they were on vacation and were going to Oklahoma, then said they were going to Kansas. Tr. 18. When asked about her relationship with Mr. Bravo, she indicated that he was her boyfriend and they were not married. Tr. 18.

Six minutes into the stop, the agent called for a drug dog. Tr. 41-43, 61.

-3-

The agent simultaneously received notification that Mr. Bravo had been arrested for drug violations in 2006. Tr. 19, 61. The agent issued a warning to Mr. Bravo and the traffic stop ended approximately ten minutes after it had begun. Tr. 19-20, 61-62.

The agent then asked Mr. Bravo if he could ask him a few more questions, and Mr. Bravo agreed. Tr. 20. When the agent asked whether Mr. Bravo had any illegal drugs in his vehicle, Mr. Bravo said no and declined to consent to a search of his vehicle or to have a drug dog "scan" it. The agent then directed Mr. Bravo to return to the patrol car. Tr. 20-21. Shortly thereafter, another agent arrived with the drug dog "Jake" and the dog alerted to the presence of drugs. Tr. 21-22, 63-64. At that point, six minutes had elapsed from the issuance of the warning to the point when the drug dog alerted. Tr. 62-64. Confronted with the information about the contraband, Mr. Bravo admitted that the vehicle contained marijuana. The agents searched the vehicle and ultimately discovered 482 pounds of bundled marijuana in hidden compartments. Tr. 22-24.

After an evidentiary hearing, the district court denied Mr. Bravo's motion to suppress after finding that (1) the agent's initial stop was justified, Tr. 66; (2) the continued detention of Mr. Bravo was lawful because it was based upon reasonable suspicion, Tr. 66-67; and (3) after the drug dog alerted, there was probable cause to search the vehicle, Tr. 67-68. The district court relied upon the following factors as giving rise to reasonable suspicion: (1) the agent's

observation of numerous air fresheners in the vehicle, along with the strong smell of air fresheners; (2) the minimal amount of baggage in the vehicle, which was inconsistent with Mr. Bravo's honeymoon story; (3) inconsistent statements made by Mr. Bravo and Ms. Felix, including the inconsistency regarding their marriage and destination; (4) Mr. Bravo's extreme nervousness, including trembling, heavy carotid pulse, noticeable belching, avoidance of eye contact, rapid speech and stammering; and (5) information regarding Mr. Bravo's prior drug-related arrest.[1] Tr. 64-65.

## Discussion

When reviewing a district court's denial of a motion to suppress, we view the evidence in the light most favorable to the government and accept the district court's findings of fact unless they are clearly erroneous. United States v. Chavira, 467 F.3d 1286, 1290 (10th Cir. 2006); United States v. Rosborough, 366 F.3d 1145, 1148 (10th Cir. 2004). We review the ultimate issue of Fourth Amendment reasonableness de novo. United States v. Alcaraz-Arellano, 441 F.3d 1252, 1258 (10th Cir. 2006). Mr. Bravo bears the burden to prove the challenged

---

[1] Three other factors piqued the agent's suspicions: (1) the vehicle came from a narcotics source city and was traveling northeast, Tr. 10-11, 21; (2) the glove box was not "full of junk," and contained only insurance and registration papers, Tr. 12-13; and (3) the vehicle was recently registered, Tr. 13-14. The court did not list these as among "the more cogent factors" it relied upon. Tr. 64-65.

search and seizure was unlawful. Rosborough, 366 F.3d at 1148.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV; see Mapp v. Ohio, 367 U.S. 643, 655-57 (1961) (incorporating the Fourth Amendment to the states through the Fourteenth Amendment). A traffic stop is a seizure for the purposes of the Fourth Amendment. Delaware v. Prouse, 440 U.S. 648, 653 (1979); United States v. Laughrin, 438 F.3d 1245, 1247 (10th Cir. 2006). We analyze traffic stops under the "reasonable suspicion" rubric set out in Terry v. Ohio, 392 U.S. 1, 27 (1968). United States v. Callarman, 273 F.3d 1284, 1286-87 (10th Cir. 2001); United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000). In making the Terry inquiry in the traffic stop context, we inquire as to whether the traffic stop was justified at its inception and whether it was reasonably related in scope to the circumstances that justified the interference in the first place. Id.; United States v. Botero-Ospina, 71 F.3d 783, 786 (10th Cir. 1995) (en banc).

Here, we conclude that, given the findings of the district court, the traffic stop was justified at its inception. "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." Botero-Ospina, 71 F.3d at 787. The district court found that Mr. Bravo "changed lanes without signaling" and was observed by an

-6-

agent doing so. Tr. 57. Thus, the agent observed a traffic violation, namely, Mr. Bravo's failure to comply with Okla. Stat. Ann. tit. 47 § 11-309(2) (2007). We do not look beyond the observed traffic violation to the subjective intent of the officer in order to determine whether the traffic stop is a "pretext" for pursuing some other investigatory purpose. Whren v. United States, 517 U.S. 806, 809-16 (1996); see City of Indianapolis v. Edmond, 531 U.S. 32, 45 (2000) (recognizing that Whren has established that "an individual officer's subjective intentions are irrelevant to the Fourth Amendment validity of a traffic stop that is justified objectively by probable cause to believe that a traffic violation has occurred"); United States v. Burkley, 513 F.3d 1183, 1186 (10th Cir. 2008).

However, Mr. Bravo challenges the validity of the traffic stop by arguing that a stop conducted by the Canine Interdiction Unit of the Oklahoma Bureau of Narcotics is the equivalent of a roving drug checkpoint program that the Supreme Court struck down in Edmond. Aplt. Br. 8. However, Mr. Bravo did not preserve this issue for appeal. While Mr. Bravo reserved the right to appeal the denial of the motion to suppress, R. Doc. 48 at 5 ¶ 8(a), we note that "[a] reservation of the right to appeal a specific pretrial ruling by the district court extends only to theories raised in the challenged ruling," United States v. Ochoa-Colchado, 521 F.3d 1292, 1299 (10th Cir. 2008). Mr. Bravo did not argue that the initial stop violated Edmond in his written motion, supplement, or oral presentation to the district court; rather, he argued that the agent lacked reasonable suspicion to

-7-

detain him after the traffic stop, that the agent lacked jurisdiction as a narcotics officer to stop him for a traffic violation, and that the agent's actions constituted selective enforcement violative of the Equal Protection Clause.  See R. Doc. 18 at 3, 7, 14-15; R. Doc. 37.  Accordingly, Mr. Bravo failed to preserve the Edmond argument for appeal.[2]

Mr. Bravo further argues that, even if the initial stop was justified, its scope and length was unjustified.  First, he argues that the agent converted the traffic stop into the functional equivalent of a custodial arrest by placing Mr. Bravo in the back of the agent's car and that, accordingly, any statements he made in response to the agent's questions should not have been used to justify his continued detention because they were taken in violation of Miranda v. Arizona, 384 U.S. 436 (1966).  Aplt. Br. 13-14; see Rhode Island v. Innis, 446 U.S. 291, 297, 300-02 (1980).  This first argument was not properly preserved for appellate review, as it was not raised in the motion to suppress.  R. Doc. 18.  Accordingly, we do not reach this particular theory as to why Mr. Bravo's continued detention

---

[2] Moreover, this case is easily distinguishable from Edmond and therefore the argument is without merit.  Edmond involved a programmatic purpose to uncover evidence of ordinary criminal wrongdoing (drug trafficking), Edmond, 531 U.S. at 40-43, "without individualized suspicion," id. at 45-46.  Here, in contrast, the programmatic purpose of drug interdiction which the agent  testified to, Tr. 29-32, is carried out only when there is individualized suspicion that a traffic violation has occurred.  Because the stop was objectively justified, we do not look beyond that justification to the officer's unit assignment.  See United States v. Patterson, 472 F.3d 767, 775 (10th Cir. 2006) (finding a stop to be justified even though the officer's unit assignment was to detect drug couriers).

was unlawful.[3]  See Ochoa-Colchado, 521 F.3d at 1299.

Second, Mr. Bravo argues that his continued detention cannot be justified by the factors the district court relied upon to find that the agent had the reasonable suspicion necessary to continue the detention once the traffic stop was complete.  Aplt. Br. 15-18.  "Once the warning or citation has been issued and the driver's license and registration have been returned, . . . the officer generally must allow the driver to proceed without further delay."  United States v. Karam, 496 F.3d 1157, 1161 (10th Cir. 2007); see Illinois v. Caballes, 543 U.S. 405, 407 (2005) (stating that a traffic stop can become unlawful if prolonged beyond the time reasonably required for that purpose).  "Further detention is permissible only if '(1) the officer develops an objectively reasonable and articulable suspicion that the driver is engaged in some illegal activity, or (2) the initial detention becomes a consensual encounter.'"  Karam, 496 F.3d at 1161 (quoting Rosborough, 366 F.3d at 1148) (internal quotation marks and alterations omitted).  Here, the continued detention was not consensual after Mr. Bravo refused to grant consent to search his vehicle or run a drug dog around it.  Tr. 20, 63-64.  Accordingly, the case turns on whether the agent possessed objectively

---

[3] In any event, persons detained during a traffic stop typically are not "in custody" for purposes of Miranda.  Wilson v. Sirmons, 536 F.3d 1064, 1110 (10th Cir. 2008).  We do not believe Mr. Bravo has demonstrated that the agent's actions were sufficient to transform the traffic stop into a custodial interrogation.  See United States v. Raynor, 108 F. App'x 609, 613 (10th Cir. 2004) (unpublished opinion).

reasonable, articulable suspicion of criminal activity at that point in order to continue the detention without Mr. Bravo's consent.  Rosborough, 366 F.3d at 1148.

To determine whether an investigatory stop is supported by reasonable suspicion, this court "must look at the 'totality of the circumstances' . . . to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."  United States v. Arvizu, 534 U.S. 266, 273 (2002); see Karam, 496 F.3d at 1162.  We assess each factor individually but consider whether the factors taken as a whole support a finding of reasonable, articulable suspicion.  Karam, 496 F.3d at 1162.

The factors the district court relied upon do in fact support the finding that the agent had reasonable, articulable suspicion to detain Mr. Bravo for the brief period between the moment the agent gave Mr. Bravo the traffic warning and the moment the drug dog alerted, giving probable cause to search the vehicle.  See Tr. 62-63 (setting forth the district court's finding that this five or six minute period was the extended detention period for which reasonable, articulable suspicion was necessary).  We have noted that each factor relied upon by the district court is a valid consideration, including (1) the air freshener, United States v. West, 219 F.3d 1171, 1178-79 (10th Cir. 2000); (2) the minimal baggage visible in a vehicle without a trunk, considering Mr. Bravo's honeymoon story,  United States v. Ledesma, 447 F.3d 1307, 1318 (10th Cir. 2006); United States v. Mendez, 118

F.3d 1426, 1431 n.3 (10th Cir. 1997); (3) the contradictory answers of Mr. Bravo

and Ms. Felix, United States v. Wallace, 429 F.3d 969, 976 (10th Cir. 2005); (4)

numerous physical manifestations of nervousness, United States v. Bradford, 423

F.3d 1149, 1157 (10th Cir. 2005); United States v. Santos, 403 F.3d 1120, 1127

(10th Cir. 2005); and (5) prior drug history, Santos, 403 F.3d at 1132.  Judging

from these several factors[4] under the totality of the circumstances, we conclude

that the agent was justified in briefly detaining Mr. Bravo while waiting for the

arrival of the drug dog.

     AFFIRMED.

                    Entered for the Court


                    Paul J. Kelly, Jr.
                    Circuit Judge

---

    [4] We note that the contradictory statements regarding Mr. Bravo's marital status and travel plans were particularly cogent in terms of creating reasonable suspicion.  As noted, the district court did not rely upon the source city and route (leaving Deming, New Mexico in a northeasterly direction), the glove box containing only insurance and registration papers, and relatively recent registration papers in its reasonable suspicion analysis, nor do we.