**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 12a0574n.06**

**No. 11-5131**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | **_Jun 05, 2012_** |
| | ) | LEONARD GREEN, Clerk |
| v. | ) | On Appeal from the United States |
| | ) | District Court for the Eastern |
| | ) | District of Tennessee |
| KELVIN JOHNSON, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

Before:      BOGGS, SUHRHEINRICH, and COOK, Circuit Judges.

BOGGS, Circuit Judge.  Kelvin Johnson was pulled over for speeding.  But that was the least of his worries.  Johnson was a convicted felon, and there was a loaded gun beneath the driver's seat of his car.  During the stop that followed, Chattanooga Police Officer Jason Duggan began to suspect that Johnson was involved in some sort of criminal activity.  After he finished writing Johnson a warning ticket, Officer Duggan engaged Johnson in conversation and ultimately asked for consent to search Johnson's car.  When Johnson refused, Officer Duggan detained him and called for a drug dog.  The dog alerted, indicating that it smelled drugs on or in the car.  Clothed with power from the dog's alert, Officer Duggan searched the car, found the gun, and arrested Johnson.  Johnson moved to suppress the gun, as the fruit of an unlawful search.  He argued that Officer Duggan's extending the stop after writing the warning ticket violated the Fourth Amendment because there were not specific facts that would lead a reasonable officer to suspect criminal activity.

The district court denied Johnson's motion, and Johnson pleaded guilty. Johnson appeals the suppression decision. We reverse.

I

Around 9:00 p.m. on June 2, 2009, Chattanooga Police Officer Jason Duggan spotted a Chrysler PT Cruiser traveling north on I-75 at seventy-two miles per hour in a fifty-five mile-per-hour zone. Because the PT Cruiser was speeding, Officer Duggan initiated a traffic stop. Kelvin Johnson, a six-foot five-inch tall, three-hundred-pound African American male, and the driver of the PT Cruiser, pulled promptly to the side of the road.

Officer Duggan came to the passenger side of the car. He told Johnson that he was speeding and asked for Johnson's "driver's license and paperwork on the vehicle." Johnson complied, but initially gave Officer Duggan only his license. When reminded, Johnson produced a contract, indicating that the PT Cruiser was a rental car that he had picked up approximately four hours earlier. Officer Duggan also asked "where [Johnson] was headed. [Johnson] told [Officer Duggan] Kentucky." With this information in hand, Officer Duggan returned to his patrol car, telling Johnson "we'll see if we can't work something out," as he went.

During this initial encounter, Officer Duggan claims, Johnson was "already . . . showing signs of excessive nervousness." Specifically, Johnson was "staring at [Officer Duggan] very intently. . . . like he was overly focusing on making eye contact," "[h]is hands were visibly shaking," even though the PT Cruiser's air conditioning was on, "beads of sweat were beginning to form across the top of his forehead," and, when Officer Duggan asked for Johnson's license and paperwork, Johnson only gave him his license, and had to be reminded to produce his paperwork. Officer Duggan

also testified that he found the vehicle's contents suspicious. A PT Cruiser does not have a separate trunk. Instead, the passenger cabin and cargo area are one space, divided only by seats. Officer Duggan could, therefore, see "most items . . . from the outside of the vehicle." Inside the PT Cruiser, he saw only "two little shopping bags . . . [and] industrial strength degreaser or cleaner." The shopping bags were full. On top, Officer Duggan could see some "new clothing," but he could not see everything that was in the bags. The degreaser, Officer Duggan explained,

> could be a sign that [Johnson] wants to get the grease off of the steering wheel after he works on the vehicle. It could be a sign that he wants to clean his fingerprints off a stolen handgun. It could be a sign that he wants to clean the area off of a bale of marijuana in the trunk.[1] It could be a sign that the cocaine that he may be trafficking he may be trying to clean up.

In any event, Officer Duggan found Johnson's having degreaser with him in the rental car "very rare, very unusual. . . . [and] not consistent with innocent motoring public."

When Officer Duggan returned to his patrol car, he called his "teammate . . . Officer Curvin." Officer Duggan told Officer Curvin that he "was about to call for a records check," and asked that Officer Curvin join him as back-up. Next, Officer Duggan called the Blue Lightning Operations Center ("BLOC") to initiate a detailed record check. Officer Duggan also testified that, during this time, he noticed that Johnson's rental contract only allowed the driver to operate the vehicle in Georgia and Florida. Because "Mr. Johnson at the [sic] point had already told [Officer Duggan] that he was headed to Kentucky and [Officer Duggan] had pulled him over in Tennessee," Officer Duggan considered the language in the rental contract further cause for suspicion.

---

[1] This example, of course, would not apply here because a PT Cruiser does not have a separate trunk, and Officer Duggan did not see drugs in the car.

After he contacted BLOC, Officer Duggan returned to the PT Cruiser and asked Johnson to join him in front of his patrol car. Johnson complied. Officer Duggan asked that Johnson not put his hands in his pockets. Johnson complied. Officer Duggan then told Johnson that he would write him a warning citation for speeding.

Although Johnson complied with all of his requests, Officer Duggan testified that Johnson's posture was suspicious. He believed that Johnson had taken a "bladed stance," with "his strong leg [here, his right leg] back . . . turn[ing] [his] body sideways to help defend [himself]," like a boxer might do during a fight. Officer Duggan, nevertheless, began to write Johnson's warning citation, chatting with Johnson about the PT Cruiser and Johnson's travel plans as he worked.[2]

Through this casual conversation, Officer Duggan learned that Johnson was driving to Ashland, Kentucky, near the West Virginia-Kentucky-Ohio border. Johnson planned to stay there for three or four nights, visiting a woman he had spoken with "for a long time" but had not met.[3] This, in Officer Duggan's estimation, made the two plastic bags even more suspicious. "[T]hat a young man would be visiting a woman for the very first time that he spoke to many times on the phone and he doesn't take any clothes. That just blew my mind."

Officer Duggan continued to talk casually with Johnson as he wrote the warning citation. He had just mentioned to Johnson the geographical limitation in the rental contract, when BLOC

---

[2] The two even shared a laugh when Johnson suggested that the car was nice, but "not suited for a man."

[3] Johnson told Officer Duggan that he would stay in Ashland until Friday. June 2, 2009 was a Tuesday.

called him with the results of the record check he requested. BLOC told Officer Duggan that Johnson's license was valid, and that there was no warrant for Johnson's arrest. However, BLOC also gave Officer Duggan an "officer safety alert" because Johnson had a criminal history that included aggravated assault, felony gun charges, and felony narcotics charges.

As Officer Duggan hung up the phone, Officer Curvin arrived and walked toward Officer Duggan's patrol car. Johnson noticed Officer Curvin's arrival, and began "cutting his eyes, watching the approaching officer." As "a way of trying to deescalate [sic] any type of added stress," Officer Duggan told Johnson that Officer Curvin was his supervisor, and that he was "here for me [Officer Duggan], not for you [Johnson]."

After Officer Curvin arrived, Officer Duggan finished writing the warning citation. He handed the citation to Johnson and asked whether Johnson could "see what [he] was talking about" with the rental car contract's geographical limitations. Johnson did not know about these limitations, insisted that he "told [the rental-car company] where [he] was going," and suggested that the language could be a mistake, since, when he rented the car, "they were kind of busy."

At that point, Officer Duggan had "given [Johnson] all of his paperwork back." Because of Johnson's size and "obvious nervous reaction to the traffic stop," Officer Duggan felt that he "needed to make sure the situation stayed as deescalated [sic] as possible. So, . . . [he] intend[ed] to make [Johnson] feel free to go." To this end, he "asked [Johnson] if he had everything . . . [that was] taken from him . . . [and] asked him if he was good to go[,] trying to ensure that he felt like he

was free to leave." Johnson said he was, shook Officer Duggan's hand, and turned back toward the PT Cruiser.[4]

Officer Duggan had other ideas.[5] He "want[ed] to engage in a consensual encounter with [Johnson]," to gather more information about what he believed "was something more than just a traffic violation." Thus, as Johnson walked away, Officer Duggan said: "Hey, you know what, let me tell you about those speeds, if you don't mind. You want to know about them?" Johnson said that he would like to know, and Officer Duggan spent the next twenty seconds explaining how the speed limit would change in the coming miles. Immediately after finishing this discussion, and without any further comment from Johnson, Officer Duggan said: "Can I ask you a couple questions, since my boss is here?" Johnson agreed. Officer Duggan asked whether Johnson had "anything illegal in the car." Johnson said that he did not. Officer Duggan then told Johnson that he would "go through the whole list," and asked that Johnson "please [not] take offense to any of them." First were drugs: marijuana, cocaine, methamphetamine, LSD, heroin, and ecstasy. Johnson flatly denied having any drugs. Officer Duggan then asked whether Johnson had any "guns, knives, weapons of any kind." Both Johnson and Officer Duggan appeared to chuckle as Johnson denied having

---

[4] Officer Duggan turned on his lights at 00:28 of the video. Johnson stopped on the side of the road at approximately 01:00. Officer Duggan shook Johnson's hand and told him to "have a safe trip" at 15:10. Thus, approximately fourteen minutes and forty-two seconds had passed since Officer Duggan turned on his lights; and fourteen minutes and ten seconds had passed since Johnson pulled to the side of the road.

[5] Officer Duggan testified that Johnson was not free to leave, even though he intentionally gave Johnson that impression.

weapons. "Prescription medications not prescribed to you . . . packages . . . [and] large amounts of cash" were next. Again, Johnson denied having any of the items Officer Duggan mentioned.

Officer Duggan next asked Johnson why he didn't have "any luggage or anything in the car . . . [no] change of clothes or anything." "Actually," Johnson replied, "I do have a change of clothes back there in the back. I have some . . . boxers, a pair of shorts, some shoes with me. When I got up there I was actually going to get me [sic] some more clothes." Officer Duggan replied: "I just thought that was a little bit suspicious, if you're going to go for that time, you want to look sharp, man." He then asked: "Can I search your car, sir?" Johnson replied: "there's no need for you to search my car, sir." Officer Duggan clarified: "Are you telling me no?" Johnson confirmed: "Yes."

In response, Officer Duggan asked Johnson to sit on the rail at the side of the road and called a canine unit. Officer Duggan next asked permission to search Johnson's person. When Johnson refused, Officer Duggan brought him to the front of the patrol car, conducted a *Terry* frisk, and ultimately let him sit on the railing near the side of the road. As he waited for the canine unit, Officer Duggan walked around the PT Cruiser, "in hopes of seeing something illegal, maybe whatever it is that he's so nervous about in plain view in hopes that maybe I wouldn't even need the dog." Before Officer Duggan could finish looking, however, Johnson called to him, complaining that his continued detention was "unfair, [that] he[] [had] been profiled, [and that] he don't [sic] understand why [Officer Duggan] want[ed] to search." Over time, Johnson grew "argumentative." He was "very upset that [he had] to wait on the dog."[6]

---

[6] For example, Johnson, without raising his voice, said: "I don't understand why I've got [sic] to go through this. I'm just trying to go on vacation. I didn't do nothing [sic]."

Officer Marty Penny and his dog, Max, arrived approximately nineteen minutes after Officer Duggan issued Johnson's warning citation. Officer Penny and Max walked around the car twice. Max, a passive-alert dog, sat near the left rear door, indicating that he smelled drugs.[7] Officer Penny told Officer Duggan that there was probable cause to search the PT Cruiser. Officer Duggan proceeded to search the vehicle. On the front passenger seat, he found "what appear[ed] to be the preliminary stages of rolling a marijuana blunt."[8] He determined that the bags in the back seat contained only brand new underwear and t-shirts. Underneath the driver's seat, Officer Duggan found a loaded gun. A later forensic examination showed that the gun had been stolen in Georgia. At no point did Officer Duggan find drugs in the PT Cruiser.

The officers took Johnson into custody. A federal grand jury indicted him on one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). Johnson moved to suppress the gun from evidence. He argued that Officer Duggan did not have the reasonable suspicion required to detain him after Officer Duggan finished writing the warning citation. After a hearing, a magistrate judge recommended that the district court deny the motion. The magistrate judge acknowledged that whether Officer Duggan had reasonable suspicion was "a difficult call," but he believed that the totality of the circumstances justified the decision to detain Johnson temporarily. The circumstances of that detention, the magistrate judge continued, were reasonable: no one handcuffed Johnson or otherwise treated him roughly, and the detention was not longer than

---

[7] A passive alert dog sits when it smells drugs; an active alert dog scratches.

[8] A "blunt" is a hollowed-out cigar or cigarillo, filled with marijuana. Officer Duggan found a CD case with a hollowed-out cigarillo inside.

necessary to achieve the purposes of the stop.[9] The district court adopted the magistrate judge's

recommendation, with the small exception noted below. Johnson pleaded guilty, reserving the right

to appeal the denial of his motion to suppress. The district court imposed a below-guidelines

sentence of fifty-five months of imprisonment, with a three-year term of supervised release. Johnson

also had to "participate in a program of testing and/or treatment for drug and/or alcohol abuse . . .

until such time as . . . [the probation officer] released [Johnson] from the program," and pay a $100

special assessment. Johnson appeals.

II

"When reviewing the denial of a motion to suppress, we review the district court's findings

of fact for clear error and its conclusions of law *de novo*." *United States v. Johnson*, 656 F.3d 375,

377 (6th Cir. 2011) (quoting *United States v. Gross*, 624 F.3d 309, 314 (6th Cir. 2010)). The

reasonableness of a seizure is a matter of law, which we review *de novo*. *United States v. Campbell*,

549 F.3d 364, 370 (6th Cir. 2008). Also *de novo* is our review of the mixed legal and factual

question whether an officer had reasonable suspicion sufficient to justify extending a traffic stop.

*Ibid.*; *see also Ornelas v. United States*, 517 U.S. 690, 699 (1996).[10]

---

[9] The magistrate judge wrote that the detention was for "30 to 35 minutes." R. 15 at 12. The Government objected to this calculation, arguing that the relevant period of detention only began *after* Officer Duggan finished writing Johnson a warning citation. The district court sustained this objection, but held that the time difference did not change the reasonableness analysis. R. 19 at 3.

[10] At oral argument, the parties suggested that our review here is for clear error. Of course, this is so for matters of fact. For legal issues, and the mixed issue of assessing the reasonableness of suspicion, however, we review the district court's decision *de novo*.

By contrast, we may only upset a district court's finding of fact when, "utilizing the entire evidence . . . [we are] left with the definite and firm conviction that a mistake has been committed." *United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007) (internal quotation marks omitted) (quoting *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999)). "When the district court has denied the motion to suppress, we review all evidence in a light most favorable to the Government." *United States v. Galloway*, 316 F.3d 624, 628 (6th Cir. 2003). Because "the district court is at an institutional advantage, having observed the testimony of the witnesses and understanding local conditions . . . . 'due weight' should [also] be given to the inferences drawn from the facts by 'resident judges.'" *United States v. Townsend*, 305 F.3d 537, 542 (6th Cir. 2002) (internal citations omitted).

Ultimately, "[i]t is the [Government's] burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Florida v. Royer*, 460 U.S. 491, 500 (1983).

III

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. Detention of an individual during a traffic stop is a seizure within the meaning of the Fourth Amendment, *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009),[11] analogous to a brief investigative detention. *United States v. Hill*, 195 F.3d 258, 264 (6th

---

[11] "There is some confusion in this circuit over whether officers must have reasonable suspicion or probable cause in order to initiate a traffic stop. . . . [However] [t]his conflict need not

Cir. 1999). "Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot." *Hill*, 195 F.3d at 264. The extension of a stop beyond its original purpose, in other words, is a new Fourth Amendment event. It resets the *Terry* clock.

Whether an officer has a reasonable and articulable suspicion sufficient to justify such extended detention depends on "the totality of the circumstances presented to the officer." *United States v. Jones*, 673 F.3d 497, 502 (6th Cir. 2012). "Police officers are permitted to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Shank*, 543 F.3d 309, 315 (6th Cir. 2008) (internal quotation marks and citation omitted). An officer's subjective belief about what he is investigating, though, is irrelevant. If the circumstances, objectively, would have given an officer reason to believe that criminal activity was afoot, the officer may extend the stop, even if there is no reasonable suspicion for the crime that he believes he is investigating. *Whren v. United States*, 517 U.S. 806, 813 (1996); *see also United States v. Haskins*, 430 F. App'x 727, 728–29 (10th Cir. 2011) ("[I]f the facts known to the officer support reasonable suspicion . . . it does not matter that the officer was motivated by a belief that a different offense (even one for which there was not reasonable suspicion) had been committed."). An "inchoate and unparticularized . . . 'hunch,'" however, will not do. *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

---

concern us here," *United States v. Alexander*, Nos. 09–5518, 09–5894 , 2012 WL 48214 at *3 (6th Cir. Jan. 10, 2012), as the parties agree that the initial stop was proper because Johnson was speeding.

The Government must, instead, point to specific facts, and describe how those facts would lead a reasonable officer to suspect illicit activity.

If the officer has a reasonable and articulable suspicion of criminal activity, he may extend a traffic stop long enough to confirm or dispel his suspicions. Any such extension, though, must be "limited in scope and duration." *Royer*, 460 U.S. at 500; *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) ("[I]f we conclude that the basis for the *Terry* stop was proper, then we must determine whether the degree of intrusion . . . was reasonably related in scope to the situation at hand.") (internal citation and quotation marks omitted). "[T]he investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time," and the "investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Royer*, 460 U.S. at 500. "While there is no rigid time limitation on the lawfulness of a *Terry* stop, we must examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Davis*, 430 F.3d at 354 (internal citation and quotation marks omitted).

Throughout this analysis, of course, we must bear in mind that "[t]he ultimate touchstone of the Fourth Amendment is [objective] 'reasonableness.'" *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011); *see also Michigan v. Fisher*, 130 S. Ct. 546, 548 (2009); *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).[12]

---

[12] It is particularly important, some argue, to adhere strictly to these standards in today's law-enforcement climate, where "the war on drugs," has led to diluted Fourth Amendment protections

The parties agree that the initial stop was proper. Appellant's Br. at 23 (challenging "Mr. Johnson's continued detention after he was issued the warning citation."). The only issue, then, is whether Officer Duggan had a reasonable and articulable suspicion that criminal activity was afoot, after he finished writing Johnson's warning citation.

Officer Duggan had no difficulty articulating his grounds for suspicion. First, he focused on Johnson's behavior, or what he called "nervous indicators." Johnson, Officer Duggan claimed, "was overly focusing on making eye contact," "[h]is hands were visibly shaking," "beads of sweat were beginning to form across the top of his forehead," and he forgot to hand over his paperwork, along with his license. Once Johnson got out of the car, Officer Duggan claims, he took a "bladed stance," with "his strong leg back . . . turn[ing] [his] body sideways to help defend [himself]," like a boxer might do during a fight, and looked at both Officers Duggan and Curvin, when Officer Curvin arrived.

The PT Cruiser's contents also made Officer Duggan suspicious. He saw only a container of industrial-strength degreaser and two plastic bags, which appeared to contain new clothing. Officer Duggan believed that possessing degreaser was "very rare, very unusual. . . . [and] not consistent with innocent motoring public." And, once he learned that Johnson planned to go on at least a three-night vacation to meet a woman he had never met before, the absence of conventional luggage "blew [his] mind."

---

during traffic-stops. *See, e.g.*, Wayne R. LaFave, *The "Routine Traffic Stop" from Start to Finish: Too Much "Routine," Not Enough Fourth Amendment*, 102 MICH. L. REV. 1843 (2004).

Finally, Officer Duggan testified that the rental contract's limitations and Johnson's prior

criminal history aroused his suspicions.  He summed up:

> I noticed the sweat, the abrupt sweating that came on when I was at the vehicle even
> though the air conditioner was on.  He's got visible shaking when he hands me his
> driver's license.  His attention is divided in so much [sic] he couldn't follow the
> simple instruction of give me the paperwork initially I had to ask for it twice.  I
> noticed circumstances surrounding what was inside the vehicle including a heavy
> duty cleaner, no luggage, just two small shopping bags appeared to have new clothing
> which later to be determined was nothing more than new underwear, new T-shirts,
> no clothing.  His travel account was awkward in that he had taken no luggage to meet
> a new female.  The contract was invalid in that it stated he only operated in the state
> of Georgia and Florida.  And yet he was in Tennessee headed to Kentucky . . . . The
> fact his criminal history showed past propensity to commit felony drug case [sic],
> felony gun charges, and has an aggravated assault which show propensity for
> violence.  All of these things along with the demeanor, stance, the guarded stance the
> whole time he was speaking with me.  All of these escalated my suspicion, I believe
> a reasonable person would believe that there was something more than just a traffic
> violation occurring.

Whether Officer Duggan's suspicion of criminal activity was reasonable, in light of these

facts, is a close question.  First, "factors such as a person's nervousness . . . while part of the

reasonable suspicion analysis, are given little weight."  *United States v. Samuels*, 443 F. App'x 156,

161 (6th Cir. 2011) (citing *United States v. Arvizu*, 534 U.S. 266, 275–76 (2002)); *see also United

States v. Richardson*, 385 F.3d 625, 630–31 (6th Cir. 2004) ("[A]lthough nervousness has been

considered in finding reasonable suspicion in conjunction with other factors, it is an unreliable

indicator, especially in the context of a traffic stop.  Many citizens become nervous during a traffic

stop, even when they have nothing to hide or fear.") (internal citations omitted).  Rightly so.

Especially where, as here, the "nervous indicators" an officer cites are such relatively commonplace

behaviors as eye contact, apprehensiveness while handing over a license, sweating, forgetting to

provide paperwork, standing,[13] and looking back and forth between two officers, a court risks

impaling the defendant on Morton's Fork.[14]  Had Johnson averted his eyes and slouched, he might

have been considered evasive.  Because he stood straight and maintained eye contact, Officer

Duggan considered him aggressive.  Johnson simply could not win.  Nervous indicators are weak

indicators in the traffic-stop context.

But Officer Duggan pointed to more than Johnson's behavior.  He also cited Johnson's taking

a vacation without conventional luggage, his possessing industrial-strength degreaser, the

geographical limitations in the rental contract, and the fact that he had prior felony convictions.

---

[13] Johnson's stance was not, as Officer Duggan suggested, bladed—or at least not to a degree that might reasonably suggest combativeness.  A bladed stance involves straightening the front leg so that most of the body's weight is over the back leg, and turning the shoulders to minimize the area that an opponent can strike.  Our review of the record shows that Johnson did no such thing.  *See Scott v. Harris*, 550 U.S. 372, 378–81 (2007) (relying on videotape to hold, contrary to lower courts's view, that no reasonable jury could have believed that defendant posed no danger to human life).  He faced Officer Duggan squarely, with his weight evenly distributed and his shoulders pulled back, not turned sideways.  The district court committed clear error in finding that Johnson's stance was "bladed."

[14] Morton's Fork, the Oxford English Dictionary explains, was:

[Archbishop of Canterbury, Cardinal, and Minister of Henry VII] John Morton's (supposed) method of levying forced loans by arguing that those who were obviously rich could afford to pay, and those who lived frugally must have amassed savings . . . . Hence in extended and allusive use [it is]: a practical dilemma, [especially] one in which both of the choices or alternatives available disadvantage or discredit the chooser.

OXFORD ENGLISH DICTIONARY (Online Ed., March 2012).

Like Johnson's behavior, his lack of conventional luggage is not a particularly strong indicator of illicit activity. Of course, as the Government points out, a paucity of luggage can be a factor in the reasonable-suspicion analysis. *See, e.g.*, *United States v. Bravo*, 306 F. App'x 436, 441–42 (10th Cir. 2009); *United States v. Hernandez*, 418 F.3d 1206, 1211 (11th Cir. 2005); *but see United States v. Tapia*, 912 F.2d 1367, 1371 (11th Cir. 1990) ("[B]eing Mexican, having few pieces of luggage, being visibly nervous or shaken during a confrontation with a state trooper, or traveling on the interstate with Texas license plates (not yet a crime in Alabama), do not provide a minimal, particularized basis for a conclusion of reasonable suspicion . . . ."). Here, though, all that Officer Duggan knew when he decided to prolong the stop was that Johnson had newly bought clothing near the top of two plastic bags, and no suitcases. He could not have known anything else about the bags' contents at that time. Perhaps it is most common to pack in a suitcase when going out of town. But this does not mean that putting clothes in a plastic bag, instead of some other container, is inherently suspicious. Johnson's trip was relatively short. He was alone. He did have some clothing with him. And he explained to Officer Duggan that he planned to buy more clothes when he arrived in Ashland. *Cf. Bravo*, 306 F. App'x at 441–42 (finding allegedly honeymooning couple's one small duffel bag suspicious); *Hernandez*, 418 F.3d at 1211 (finding two small bags for two-person week-long trip suspicious).[15] Thus, while Johnson's paucity of luggage has a place in the reasonable-suspicion analysis, it does not play a large role here.

---

[15] Notably the cases that deal with lack of luggage as part of the reasonable-suspicion analysis involve the *amount* of luggage the defendant had, not the *container* the defendant used to pack.

The remaining three factors that Officer Duggan cited are more substantial indicia of criminal activity. An otherwise innocuous item that, in the officer's experience, suggests criminal activity, *see, e.g.*, *Hill*, 195 F.3d at 272 ("it was reasonable to conclude that Deputy Whitlock's observance of the large amount of used Kleenex on the floorboard of the truck, indicating that one or both of Defendants were using cocaine based upon his experience as an interdiction officer that cocaine users have to wipe their noses often . . . contributed to his suspicion that criminal activity was afoot."), an oddity in a rental-car contract, *see, e.g.*, *United States v. Branch*, 537 F.3d 582, 588 (6th Cir. 2008) (listing defendants' having driven "a rental car that was several weeks overdue" as a factor supporting reasonable suspicion), and a driver's criminal history, *see Joshua v. DeWitt*, 341 F.3d 430, 446 (6th Cir. 2003), are all legitimate considerations in the reasonable-suspicion analysis.

Here, Officer Duggan noticed industrial-strength degreaser on the floor of the PT Cruiser. He believed that degreaser could be used to wipe fingerprints from a gun, or to clean drug residue from a car. Johnson's possessing it, Officer Duggan testified, was "very rare, very unusual. . . . [and] not consistent with innocent motoring public." Also, Johnson was driving through Tennessee, en route to Kentucky, even though he could only drive in Florida and Georgia, under the terms of his rental contract. Of course, this could have been an innocent mistake, as Johnson claimed during the stop. But the possibility of an innocent explanation does not keep the inconsistency between Johnson's rental contract and travel plans out of the reasonable-suspicion analysis. *See Arvizu*, 534 U.S. at 277–78. Finally, Officer Duggan learned about Johnson's criminal history during the part

of the traffic stop that the parties agree was valid. That history could, therefore, bolster Officer Duggan's suspicion that criminal activity was afoot. *See Joshua*, 341 F.3d at 446.

The dispositive question is whether these relatively stronger indicia, combined with Johnson's behavior and his lack of conventional luggage, would have led to a reasonable belief that Johnson was involved in criminal activity. "Undoubtedly, each of these factors alone is susceptible of innocent explanation, and some factors are more probative than others." *Arvizu*, 534 U.S. at 277. But this is beside the point. "Reasonable suspicion is based on the totality of the circumstances presented to the officer." *Jones*, 673 F.3d at 502.

"The process [of determining whether an officer had reasonable suspicion] does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same—and so are law enforcement officers." *United States v. Cortez*, 449 U.S. 411, 418 (1981). "[T]he concept [of reasonable suspicion, then] . . . is somewhat abstract," *Arvizu*, 534 U.S. at 274, and "the standards are not readily, or even usefully, reduced to a neat set of legal rules." *Ornelas*, 517 U.S. at 695–96 (internal quotations omitted). Indeed, "[t]he Supreme Court has recognized that, in the course of adjudicating reasonable suspicion, one determination will seldom be a useful precedent for another." *Townsend*, 305 F.3d at 542 (internal quotation marks omitted) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 n.11 (1983)).

And, perhaps predictably, our reasonable-suspicion cases do not offer a coherent principle that resolves the question we face. *United States v. Garrido*, 467 F.3d 971, 982 (6th Cir. 2006)

(collecting cases); *compare United States v. Townsend*, 305 F.3d 537, 542–45 (6th Cir. 2002) (holding that officers did not have reasonable suspicion to justify extending traffic stop based on defendant's cooperative behavior, late-night travel from a known source city for narcotics, possession of three cell phones, presence of a bible, what appeared to be rolls of currency, defendant's criminal history, indications of nervousness, food wrappers and clothing in the car, and driver's not being registered owner of car), *with Hill*, 195 F.3d at 271–73 (holding that implausible explanation for trip, inconsistent explanation of itinerary, presence of Kleenex in U-Haul truck, and nervousness furnished reasonable suspicion to extend stop long enough for canine sniff), *and Branch*, 537 F.3d at 588 (holding that reasonable suspicion existed where defendants actively avoided officer at mini-mart, drove rental car that was two weeks overdue, had driver's licenses that did not match alleged residences, and displayed nervousness), *and United States v. Walton*, 258 F. App'x 753, 758 (6th Cir. 2007) (holding that stack of cash in glove box, coupled with denial of traveling with large amounts of money, conflicting explanation of travel plans, and passenger's not having a driver's license, but admitting to having driven, furnished reasonable suspicion for one-minute eighteen-second extension of stop). Our task, therefore, is to "slosh our way through the factbound morass of reasonableness," *Scott*, 550 U.S. at 383 (internal quotation marks omitted), and decide whether Officer Duggan had enough reasonable suspicion to detain Johnson after he finished writing the warning ticket.

Officer Duggan clearly believed that criminal activity was afoot. This belief, however, was not reasonable in the totality of the circumstances. Johnson's behavior and his lack of conventional

luggage are exceptionally weak indicators of criminal activity. The fact that he had committed crimes in the *past*, while it has a place in the reasonable-suspicion analysis, is not, without more, strong evidence of criminal activity in the *present*. Nor is it clear how the disconnect between the rental-car contract's geographical limitations and Johnson's travel plans implicated criminal activity. There was, without question, inconsistency. But the relationship between that particular inconsistency and any illicit activity is tenuous, at best. Unlike a rental car several weeks past-due, driving a car in a state neighboring the state where the contract allows the driver to operate does not suggest theft or other wrongdoing. *Cf. Branch*, 537 F.3d at 588. That leaves the degreaser. Degreaser could, of course, have a number of unsavory uses. But it is also commonplace for people who work on cars. "Since 2006, [Johnson] has owned and operated JK's Motors and Transmission." This, of course, does not affect whether Officer Duggan's suspicion was objectively reasonable.[16] Rather, it shows that mere possession of degreaser is not a strong, or even sure, sign of criminal activity. The totality of these weak indicia could lead to little more than a hunch. That is simply not enough. *See Townsend*, 305 F.3d at 545 ("Although the government has pointed to several factors, present in this case, which we have recognized as valid considerations in forming reasonable suspicion, they are all relatively minor and, in many cases, are subject to significant qualification. The fact of the matter is that this case lacks any of the stronger indicators of criminal conduct that

---

[16] Were it necessary to reach the scope-and-duration analysis, Officer Duggan's failure to ask about the degreaser might have been significant, since Johnson's owning a body shop (and possibly his desire to be more presentable, given his stated purpose) could have dispelled Officer Duggan's suspicions and shortened the detention.

have accompanied these minor factors in other cases. We hold that the officers lacked reasonable suspicion to detain the defendants until the canine unit arrived.").[17] Officer Duggan violated the Fourth Amendment.

IV

This is a close case. But the weak indicators that Officer Duggan cited, even combined, do not lead to the conclusion that he had a reasonable and articulable suspicion of criminal activity, in the totality of the circumstances. Officer Duggan's detaining Johnson after he finished writing the citation, therefore, violated the Fourth Amendment. The gun found after that detention should have been suppressed. *See Wong Sun v. United States*, 371 U.S. 471 (1963). We REVERSE the decision below, and remand for further proceedings consistent with this opinion.

---

[17] Because of this conclusion, we need not address the scope and duration of the stop. In any event Johnson did not raise, and therefore waived, that issue.

No. 11-5131
*United States v. Johnson*

**SUHRHEINRICH, Circuit Judge, dissenting.** The majority holds that Officer Duggan

lacked reasonable suspicion of criminal activity to detain Defendant Kelvin Johnson after a routine

and undisputedly constitutional traffic stop. As I believe that the totality of the circumstances

permitted Officer Duggan to detain Johnson and search his rental vehicle, I would affirm the district

court's denial of Johnson's motion to suppress the stolen gun found under the passenger seat.

Accordingly, I must respectfully dissent.

The magistrate judge, whose Report and Recommendations the district court adopted in its

decision denying Johnson's motion to suppress, found that Officer Duggan had articulated an

objectively reasonable suspicion of criminal activity based on the following factors:

> (1) defendant appeared excessively nervous-far too nervous for normal traffic stop jitters. He had begun to sweat, his hands were shaking, he stared intensely at Officer Duggan;
> (2) defendant stood in a "bladed" stance indicating to Officer Duggan, based on his training, that defendant was in a fight or flight mode;
> (3) defendant said he was going to see a woman he had never met for several days, but he had no luggage, only a few packs of new underwear and T-shirts;
> (4) he was carrying heavy duty industrial degreaser in a car he had rented to go visit a woman. Duggan testified that such cleaner could be used to wipe finger prints;
> (5) the rental paperwork for the car limited the car's geographical range to Georgia and Florida, but the defendant was driving in Tennessee en route to Kentucky; and
> (6) the defendant had multiple arrests on [felony weapons and] narcotics charges.

*United States v. Johnson*, No. 1:09-cr-179, 2010 WL 2901852, at *5 (E.D. Tenn. May 19, 2010).

The majority acknowledges that to varying degrees, all but one of these factors had a role in Officer

- 22 -

Duggan's reasonable suspicion analysis.[18] In lieu of considering the reasonableness of the suspicion created by the factors in combination, as the totality of the circumstances test obliges us to do, however, it disassembles each factor individually. In so doing, it concludes that every one could have been entirely innocent. *See*, *e.g.,* Majority Op. at 15 (nervous behaviors during a traffic stop are commonplace); *id*. at 16-17 (explanation for paucity of luggage was believable); *id*. at 20 (past crimes are not highly probative of present criminality); *id*. at 20-21 (Johnson could have used the degreaser to work on cars); *id*. at 20 (failure to abide by the terms of the rental car contract does not suggest wrongdoing or theft). Finally, it concludes that together, these independently unremarkable circumstances could lead Officer Duggan to nothing more than a "hunch" that criminal activity was afoot—an insufficient level of reasonable suspicion to detain Johnson. I disagree with the majority's analysis, for two principal reasons.

First, by focusing on the identified factors individually, and only nominally considering their collective impact, the majority has misapplied the totality of the circumstances test applicable to our reasonable-suspicion analysis.

As the majority correctly observes, "[o]nce the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot." *Hill*, 195 F.3d at 264

---

[18]After watching the video from Officer Duggan's patrol vehicle, the majority holds that the district court clearly erred in finding that Johnson had assumed a "bladed" stance. For the reasons discussed *infra*, I would conclude that even in the absence of this factor, Officer Duggan had reasonable suspicion to detain Johnson.

(internal citations omitted). Whether such reasonable suspicion exists depends not on the individually presented characteristics of the stop, but on "the totality of the circumstances presented to the officer." *Jones*, 673 F.3d at 502. What is more, "[p]olice officers are permitted to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them . . ." —inferences that "might well elude an untrained person." *Shank*, 543 F.3d at 315 (internal quotation marks and citation omitted). In my view, the majority's analysis side-steps these important principles. It concludes that individually weak factors are necessarily weak in combination, without assessing whether the coincidence of multiple factors impacts their strength in the reasonable-suspicion analysis. In other words, while the majority purports to apply a totality of the circumstances test, it does not.

One example should illustrate. In its opinion, the majority acknowledges that Johnson had industrial strength degreaser in his backseat, which it agrees "ha[s] a number of unsavory uses," including wiping fingerprints off of a stolen weapon or cleaning drug residue from a car. It also acknowledges that Officer Duggan knew Johnson had been convicted on narcotics and stolen weapon charges in the past, a factor it accepts as somewhat probative in the reasonable-suspicion analysis. As if wearing blinders, however, the majority focuses on both of these elements individually, ultimately finding them weak indicia of Johnson's criminality and insufficient bases for Officer Duggan's purported suspicion. It altogether fails to consider, as the totality of the circumstances test would have it do, whether the possession of industrial strength degreaser is any more suspicious when it is in the possession of someone who would know how to use it for its

"unsavory" purposes, or whether Johnson's criminal history is any more relevant to his present criminality given his possession of an instrument very likely to aid him in the commission of the same crimes of which he had been previously convicted. In essence, the majority disregards its own directive that the factors presented to Officer Duggan must be considered collectively, rather than in isolation.

Second, given the totality of the circumstances presented during Johnson's traffic stop, I disagree with the majority's conclusion that Officer Duggan did not have an articulable and reasonable suspicion that criminal activity was afoot when he made the decision to further detain Johnson.

Although precedent is not always especially applicable in our particularized and fact-driven reasonable-suspicion analysis, *see Townsend*, 305 F.3d at 542, there is striking congruence between *United States v. Hill* and the instant case. As the majority notes, *Hill* held that reasonable suspicion existed for officers to continue to detain the defendant after an authorized traffic stop based primarily on the defendants' nervous demeanor, suspicious travel story, and the presence of large amounts of Kleenex in their truck, which the officers knew to be consumed in large quantities by cocaine users. *See Hill*, 195 F.3d at 270-73. Similarly, in this case, Johnson was displaying nervous behaviors and had an awkward travel account. See Majority Op. at 14-15 ("His travel account was awkward in that he had taken no luggage to meet a new female.") (citing R. 35 at 26-27). Johnson's possession of industrial strength degreaser was the same as the *Hill* defendants' possession of Kleenex, as well, in that both goods appeared superficially innocent to an untrained observer, but indicative of an

ongoing crime to a trained law enforcement officer. Indeed, the only real difference between *Hill* and the instant case is that where the officers in *Hill* predominantly relied upon the interplay of the aforementioned factors to develop their objectively reasonable suspicion of criminal activity, Officer Duggan relied on the collection of these factors, plus more. *See Johnson*, 2010 WL 2901852, at \*5 (listing additional factors relied upon by Officer Duggan, including, *inter alia*, Johnson's criminal history and violation of his rental car contract). Thus, if anything, the case for reasonable suspicion in stronger here.

Taken together, I would conclude that the totality of the circumstances at the time Officer Duggan decided to further detain Johnson created a objectively reasonable suspicion that criminal activity was afoot. Although not necessarily illegal, the fact that Johnson was driving his rental car in states prohibited by his rental car contract was certainly improper and might reasonably have aroused suspicion. *See Branch,* 537 F.3d at 588. This, in combination with Johnson's story about having a commitment to spend multiple days with a woman he had never met—while carrying nothing more than unopened packages of underwear and white t-shirts—is odd, indeed. The majority points out that nervousness, alone, is too commonplace to be considered highly probative in the reasonable-suspicion analysis. Majority Op. at 15. I agree. An agitated everyday motorist, however, is quite different from a convicted felon who becomes nervous when he is pulled over with industrial strength degreaser in his car.

While of course it is *possible* that all of these unusual circumstances were coincidental and entirely innocent, "[t]he process [of determining reasonable suspicion] does not deal with hard

certainties, but with probabilities." *Cortez*, 449 U.S. at 418. And, while we must ourselves analyze whether an officer's suspicion of criminal activity was reasonable, we do so in recognition of the fact that law enforcement officers are trained to make deductions from circumstances presented in the course of duty, while we are not. *See, e.g., id.*; *Shank*, 543 F.3d at 315 (finding that the special training and experience of police officers permits them to draw "inferences from and deductions about the cumulative information available to them that might well elude an untrained person."). Officer Duggan, who at the time of Johnson's stop and detention had "approximately three hundred hours of interdiction training in traffic enforcement, interviewing persons, and interpreting criminal behavior," testified that Johnson's possession of degreaser was "very rare, very unusual. . . [and] not consistent with the innocent motoring public . . ." and that "[a]ll of the[] [circumstances presented] escalated [his] suspicion" and made him "believe that there was something more than just a traffic violation occurring." *Johnson*, 2010 WL 2901852, at *1; R.35 at 26-27, 58. The magistrate judge credited Officer Duggan's deductions and the district court adopted the magistrate's Report and Recommendations. Reviewing its conclusions *de novo* but according "due weight" to the district court, which had the institutional advantage of hearing Officer Duggan testify, I would affirm. *See Townsend*, 305 F.3d at 542 (holding that "due weight" should be given to the inferences drawn by the facts presented to the district court judge, who is at an institutional advantage in deciding whether reasonable suspicion existed).

Because I believe that the totality of the circumstances test requires courts to recognize that the whole is sometimes greater than the sum of its parts—a truism I find applicable in the instant

case—and for the reasons discussed in the magistrate judge's Report and Recommendation, *see*

*Johnson*, 2010 WL 2901852, adopted by the district court, I would find that reasonable suspicion

existed to detain Johnson after he was stopped for a routine traffic violation and would deny

Johnson's motion to suppress. Accordingly, I respectfully dissent.[19]

---

[19] The majority correctly notes that Johnson has waived any challenge to the scope and duration of Officer Duggan's detention. Were the issue to be reached, however, I would find no Fourth Amendment violation.