*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0350p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

      *Plaintiff-Appellee,*

    *v.*

MICHAEL SHANK,

      *Defendant-Appellant.*

No. 07-3544

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 03-00120—Walter H. Rice, District Judge.

Argued:  June 12, 2008

Decided and Filed:  September 19, 2008

Before:  SILER and COLE, Circuit Judges; CLELAND, District Judge.[*]

_____

## COUNSEL

**ARGUED:**  Michael H. Dzialowski, LAW OFFICE, Kalamazoo, Michigan, for Appellant.
Benjamin C. Glassman, ASSISTANT UNITED STATES ATTORNEY, Cincinnati, Ohio, for
Appellee.  **ON BRIEF:**  Michael H. Dzialowski, LAW OFFICE, Kalamazoo, Michigan, for
Appellant.  Benjamin C. Glassman, ASSISTANT UNITED STATES ATTORNEY, Cincinnati,
Ohio, for Appellee.

_____

## OPINION

_____

      CLELAND, District Judge.  Michael Shank ("Shank") was arrested after Dayton, Ohio
police officers found a firearm and crack cocaine in a car he had been driving in a neighborhood
well known for drug distribution and firearm violence.  The car, which Shank did not own and for
which he had no documents or other indication of lawful possession, had been stopped because it
had illegally tinted windows; officers carried out a protective search after they became aware that
Shank – increasingly nervous and able to identify himself only verbally – had been contacted at least
twice previously by Dayton police, each contact apparently associated with significant "dealer
quantities" of crack cocaine.

---

[*] The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting
by designation.

Shank entered a conditional plea of guilty to Count 2, Use of a Firearm During and in Relation to a Drug Trafficking Crime, 18 U.S.C. § 924(c). He appeals the district court's denial of his motion to suppress evidence, including the subject firearm. On appeal, Shank alleges that: (1) the officers lacked probable cause to effectuate a traffic stop; (2) his detention in the back of the police cruiser continued too long and violated his Fourth Amendment rights; and (3) the search of the vehicle violated his Fourth Amendment rights because the officers lacked reasonable suspicion that he was armed. For the reasons stated below, we reject each argument and **AFFIRM**.

## I.

Late in the afternoon on May 2, 2003, police officers James Mullins ("Mullins") and Rodney Barrett ("Barrett") were patrolling near the Desoto Bass housing complex in Dayton, Ohio. This complex, the officers knew, is a high-crime area well known for its drug distribution activity and shootings. The officers noticed a tan Cadillac with unusually darkened windows. Ohio law requires that tinted windows allow at least fifty percent of the light to pass through the window, and the officers estimated that the Cadillac's tinted windows would permit only about a third of the light to pass through. Although they could see through the tint well enough to tell that the driver seemed to be male and was the only occupant, the tint was sufficiently dark to obscure whether furtive or dangerous gestures were present. The officers activated the cruiser's overhead lights. The driver of the Cadillac turned onto the one-way, horseshoe shaped drive serving the Desoto Bass complex, and stopped the car in the middle of the roadway rather than pulling over to a curb.

The two officers approached the vehicle, one from each side. As Barrett reached the driver's side of the car, he could more positively identify the driver as a man and as the window was lowered he could also see that the driver was not wearing the seat belt. When Barrett asked the driver for his license and registration, he replied that he did not own the vehicle and that he did not have identification, but claimed that his name was Michael Shank. Intending to have the driver sit in the patrol car, the officers asked him to step out of the car and patted him down. They found a large lump in one pocket, but determined that it was a wad of cash and not a weapon. They replaced the cash and directed Shank to sit in the back of the police cruiser so that they could verify his identity. Shank had been relatively calm and cooperative until this point, but soon became argumentative and nervous. He did, nonetheless, eventually comply, and after he was seated Barrett entered Shank's proffered information into the patrol car's portable computer system. He found that there was a person named Michael Shank who had a valid driver's license, but also found that this person had twice previously been in contact with Dayton police during which distribution-quantity cocaine had been found.

During this time, Mullins was using a "tint meter" to more specifically measure the vehicle's windows in support of the ticket Barrett was writing, and found that the tint prevented sixty-eight percent of the light from passing through. Barrett was continuing to process written traffic citations for Shank's seat belt, driver's license and window tint violations when a resident of the Desoto Bass complex walked up and requested of Mullins that the two vehicles be moved because they were blocking vehicle access. Mullins then went back toward the cruiser to retrieve a camera to record the window tint measurements, and was met by Barrett who had alighted from the patrol car. Barrett informed Mullins of what he had learned about Shank's previous contacts with Dayton police involving "large quantities of crack cocaine in his possession." Mullins well knew that drug dealers often carry weapons, and now suspected that drugs, weapons or both might be involved in this encounter. After retrieving the camera from the police car, Mullins entered Shank's car to move it. While in the car, he checked the "lunge area," which is "the space immediately accessible" to a person seated in the car. He first opened the glove box, and found a semi-automatic handgun shoved in as though someone had "reached across with the right hand and pushed into it, the glove box." He also found a small quantity of crack cocaine in the front console. At this point, the officers placed Shank under arrest.

**II.**

When reviewing an order denying a motion to suppress evidence, we use a *de novo* standard for the district court's legal determinations, but will not set aside the district court's factual findings unless they are clearly erroneous. *United States v. Long*, 464 F.3d 569, 572 (6th Cir. 2006). "A factual finding is clearly erroneous when, although there may be evidence to support it, the reviewing court, utilizing the entire evidence, is left with the definite and firm conviction that a mistake has been committed." *United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007) (citation and quotation marks omitted).

**III.**

Shank first argues that there was no probable cause to order him to stop the car he was driving. Police officers "may briefly stop an individual for investigation if they have 'reasonable suspicion' that the person has committed a crime." *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 813 (6th Cir. 1999).

> Reasonable suspicion is "more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person . . . of criminal activity." *Houston*, 174 F.3d at 813 (alterations in original) (internal quotations and citation omitted). It requires "'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' an investigatory stop." *Id*. (quoting *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Moreover, reasonable suspicion "can arise from evidence that is less reliable than what might be required to show probable cause." *Id*.

*Weaver v. Shadoan*, 340 F.3d 398, 407 (6th Cir. 2003).

Here, the officers observed the dark tinting on the Cadillac and estimated that the tinting would permit only about thirty-three percent of the light to pass through the windows, despite applicable law requiring window tinting to allow at least fifty percent of the light to pass through. *See* Ohio Rev. Code § 4513.241; Ohio Admin. Code § 4501-41-03(A)(3). The officers were aware that the tinting was illegally dark based on their substantial prior experience enforcing this traffic regulation; indeed, the traffic stop that they just concluded before stopping Shank was for the same infraction. Due to the officers' familiarity with window tinting and their estimate that the vehicle was tinted substantially darker than permitted by law, we agree with the district court's determination that the officers had a proper basis to initiate the traffic stop.

Shank complains, in part, that his arrest may represent an example of "selective enforcement," implying that he was improperly singled out for some ulterior, presumably improper purpose. First, there is no evidence here that even hints at an improper or invidious targeting of Shank. Second, the propriety of stopping Shank for this traffic violation is unaffected by the fact that officers admittedly do not ticket, or even pull over, every vehicle they suspect has violated the window tint regulation. The law does not require police officers to stop every person suspected of illegal activity, and the officers' actual subjective motivations in effectuating the stop are irrelevant to the validity of the stop. *See Whren v. United States*, 517 U.S. 806, 812-13 (1966). "[T]he constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment." *Id*. at 813.

**IV.**

Even if an initial stop is constitutionally permissible, any subsequent detention must also comply with the Constitution and may not, therefore, "be excessively intrusive and must be reasonably related in time to the investigation." *United States v. Wellman*, 185 F.3d 651, 656 (6th

Cir. 1999). Shank argues that after Mullins had measured the window tint and after Barrett had determined that a valid driver's license existed, the purpose of the stop was complete and he should have been released.

Shank does not contest, however, that Barrett was still writing up and issuing the seat belt, tinted window and no-license-in-possession citations by the time that the local resident approached the officers complaining about the Cadillac and the patrol car blocking the one-way drive. Nor does he contest that it was only after Shank's previous association with drug trafficking incidents became known to Mullins that he entered, moved and briefly searched the Cadillac. It is clear that the purpose of the initial stop had not yet been completed when Mullins began the search. Because an officer may detain an individual in a police cruiser until the officer has finished issuing a citation, Shank's detention did not exceed the scope of the stop and was therefore constitutionally permissible. *See id.* (quoting *United States v. Bradshaw*, 102 F.3d 204, 212 (6th Cir. 1996) ("This court has ruled that an officer can lawfully detain the driver of a vehicle until after the officer has finished making record radio checks and issuing a citation, because this activity 'would be well within the bounds of the initial stop.'")).

## V.

Shank's third, and more substantial argument challenges the constitutionality of Mullins's search of the Cadillac, arguing that the officers did not have a reasonable suspicion that their safety was in danger. In *Michigan v. Long*, 463 U.S. 1032, 1047 (1983), the Supreme Court "recognized that investigative detentions involving suspects in vehicles are especially fraught with danger to police officers." Accordingly, the Court determined that "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Id.* at 1049 (quoting *Terry*, 392 U.S. at 21); *see also United States v. Foster*, 376 F.3d 577, 585 (6th Cir. 2004) (stating "the authority to conduct a *Terry* stop is 'narrowly drawn' so as to 'permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime.'") (quoting *Terry*, 392 U.S. at 27). Interestingly, the Court in *Long* was dealing with a factual setting reminiscent of the one before us, in that Long was not seated in, but only approaching his car before it was searched, just as Shank would presumably have approached the Cadillac to leave only moments after the traffic violation tickets had been completed and issued to him. The Court pointed out particularly that "the officers did not act unreasonably in taking preventive measures to ensure that there were no other weapons within Long's immediate grasp *before permitting him to reenter his automobile*." *Long*, 463 U.S. at 1051 (emphasis added).

We determine if officers had a "reasonable, articulable suspicion" of danger based upon an examination of "the individual factors, taken as a whole," and whether they "give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001) (citing *United States v. Sokolow*, 490 U.S. 1, 9 (1989)). We often examine individual facts in an "orderly fashion" and include "a brief discussion of each factor and its weight in the analysis." *Id.* at 591 (citing *Karnes v. Skrutski*, 62 F.3d 485, 495 (3rd Cir.1995)). In doing so, however, we must take care not to artificially isolate them and mistakenly subvert a legitimate totality-of-the-circumstances review. *Cf. Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973) (warning that, in examining a challenged jury instruction, each instruction must be viewed "in the context of the overall charge," and that it is important to avoid judging separate instructions "in artificial isolation."). Artificially isolated factual review distracts from being able to discern "rational inferences [to be drawn] from those facts." *Terry*, 392 U.S. at 21.

Police officers are permitted "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Martin*, 289 F.3d 392, 398 (6th Cir. 2002). We do not, however, permit reliance on mere hunches or unsupported and passing notions. Rather, a reasonable suspicion is more than an ill-defined hunch; it must be based upon "a particularized and objective basis for suspecting the particular person . . . of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).[1] "[T]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27.

We examine here whether, based on articulable facts taken as a whole, *Smith*, 263 F.3d at 588, the officers had a reasonable suspicion that Shank presented a danger and might be able to gain immediate control of a weapon from the "lunge area" of the Cadillac.[2] The record shows that the officers' suspicion was based on at least the following facts: (1) a man was observed driving a car with windows tinted so as to make it extremely difficult to detect movement of any occupants within, a violation of Ohio law; (2) the immediate area, notably the housing development the car was entering, was well-known for violent crime including shootings and considerable drug distribution activity; (3) the driver, when approached, was found not wearing a seatbelt, a second violation of Ohio law; (4) the car the man was driving did not belong to him; (5) the man had no driver's license nor any other form of personal identification or vehicle registration, a third violation of Ohio law; (6) the man verbally identified himself with a name that was soon recognized as belonging to a person having past association with cocaine dealing activities; (7) the officers knew that the distribution of drugs often involves weapons possession and use; and (8) the man appeared increasingly nervous, agitated and uncooperative upon being frisked and asked to sit briefly in the police vehicle.

Shank argues his mere presence in the high-crime area, as found by the district court, is insufficient to justify the officers' attention being drawn to him because he "can not be held accountable for the nature of the neighborhood he was stopped in." Indeed, the Supreme Court has explained, that an "individual's presence in an area of expected criminal activity, *standing alone,* is not enough to support a reasonable, particularized suspicion that the person is committing a crime." The Court stressed, however, that "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (emphasis added); s*ee also United States v. Pearce*, 531 F.3d 374 (6th Cir. 2008) ("When combined with the fact that Johnson was engaged in such behavior in an area known for criminal activity and on a street where a crime-related homicide had recently occurred, Officer Shaughnessy's observations provided a sufficient basis for temporarily detaining Johnson to determine whether he was actually engaged in wrongdoing."); *United States v. Caruthers*, 458 F.3d 459, 467 (6th Cir. 2006) (collecting cases). Here, Shank was found in the immediate vicinity of a "specific, circumscribed location where particular crimes occur with unusual regularity," *Caruthers*, 458 F.3d at 468, specifically, one housing complex known by the officers for drug distribution activity and firearm-related crime, and

---

[1] When officers are searching the *entire* vehicle for contraband — e.g., the trunk — they need "probable cause to believe that a vehicle they have stopped contains evidence of a crime." *United States v. Hill*, 195 F.3d 258, 273 (6th Cir. 1999). But as *Long* indicates, officers need only a "reasonable suspicion" that the suspect may be armed or dangerous to search the areas of the vehicle immediately accessible to the driver, as Mullins did here. *Long*, 463 U.S. at 1049.

[2] As noted above, the factual findings made by the district court are not clearly erroneous and must therefore be adopted. *See Long*, 464 F.3d at 572. Additional uncontroverted facts evident in the record may be noted as well.

that fact legitimately may be taken into account as a factor in explaining the officers' subsequent acts. *Id.* [3]

Although the "high-crime area" observation stands as nothing more than one appropriate ingredient, there was, ultimately, a cascading series of additional factors that soon came to the awareness of the officers, as listed above, which together provide sufficient context. In addition to the dangerous nature of the area, and the illegal and potentially unsafe tinting on the car windows, Shank was not able to provide identification or vehicle registration, leaving the officers to search computer records based only on a proffered name and social security number.

Barrett's database review showed that Shank had at least two previous contacts with Dayton police officers, each involving a quantity of crack cocaine indicative of distribution rather than mere possession for personal use. Based mainly upon the testimony of Barrett, the district court found that Shank was known to have "had two previous contacts with Dayton police officers, when crack cocaine had been discovered. On one occasion, slightly less than 30 grams had been discovered, while 40 grams had been found on the other." Indeed, the indictment details Shank's arrests and convictions for cocaine possession or distribution, specifically a 1998 conviction for two separate counts of trafficking of crack cocaine in the vicinity of a school in 1997 and another 1998 conviction, carried on a different 1997 case number, for possession of crack cocaine. [4]

Drug distribution, the officers knew, very often involves firearm possession and use and the obvious attendant danger. The district court credited the officers' testimony that they knew "those involved in the drug trade often carry weapons." Shank's apparent prior association with crack cocaine distribution, and the known dangerous nature of that activity, constituted additional articulable facts contributing to the officers' suspicion that Shank may have been similarly engaged in drug related activity when he was stopped. *See Joshua v. DeWitt*, 341 F.3d 430, 446 (6th Cir. 2003) (citing *Terry*, 392 U.S. at 30); *United States v. Payne*, 181 F.3d 781, 790-91 (6th Cir. 1999).

In addition to the foregoing, Shank displayed increasing nervousness and agitation upon being asked to sit in the back of the officers' vehicle. The Supreme Court has "recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Although, as is true with each other factor when taken in artificial isolation, a certain fundamental level of nervousness may be common in police encounters with citizens, and is "not a ground sufficient *in and of itself*" for finding reasonable suspicion, *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995) (emphasis added), but "nervousness is generally included as one of several grounds." *Id*. The district court found that Shank was not

---

[3] The district court's finding of fact that the Desoto Bass housing complex constituted a "high crime" area – based upon and limited to the facts present in these circumstances – is not contested on appeal. Further, there is neither an argument nor any indication in the record that the finding runs afoul of our caution in *Caruthers* that high-crime area designations not be permitted to "serve as a proxy for race or ethnicity." Even so, we pause to point out the difficulties inherent in too broadly categorizing a locale as "high crime." *See Caruthers*, 458 F.3d at 467-468 (noting "labeling an area 'high-crime' raises special concerns of racial, ethnic, and socioeconomic profiling."). This danger can be assuaged when the labeled "area is circumscribed to a specific intersection rather than an entire neighborhood," and if "the crimes that frequently occur in the area are specific and related to the reason for which [a defendant] was stopped." *Id.*

[4] In an apparent attempt at the hearing to point out the staleness of the earlier cocaine contacts, Shank's trial counsel marked as exhibits physical printouts of two field interview cards illustrating two occasions that Shank had been contacted by police in association with drugs about eight years earlier in 1995. One, in fact, appears to have been related not to cocaine, but to marijuana. It was, however, only the electronically stored information upon which Barrett relied in the field, not printed cards, and only Barrett's oral statements related to Mullins that gave Mullins any information about the apparent nature of Shank's prior contacts related to distribution-quantities of crack cocaine. In the light of the specifications in the indictment listing 1997 and 1998 events, it is fairly obvious that the printed 1995 contact cards are neither the only nor the most recent records of Dayton police contact with Shank, and do not appear to refer to the same contacts relied upon by Barrett and Mullins.

initially upset, but became "nervous and argumentative" after being asked to sit in the cruiser. The court credited the officers' testimony that "such a change in demeanor indicates that the suspect fears that the officers will discover that he is involved in criminal activity."

There is, to be sure, no magic numerosity of facts, a minimum of which must be gleaned in sifting the circumstances in order to "total up" and justify a court's confidence that the officer had reasonable suspicion to frisk or search pursuant to *Terry*. Indeed, we have found reasonable suspicion – albeit often in unpublished cases – even where very few relevant facts existed. *See, e.g., United States v. Madison*, No. 96-3970, 1997 WL 608639 (6th Cir. Oct. 1, 1997); *United States v. Boyd*, No. 93-5202, 1993 WL 533501 (6th Cir. Dec. 21, 1993).

By contrast, reasonable suspicion can been found lacking although quite a number of facts are pointed out when those facts are simply unconvincing either individually or collectively. *See, e.g., Karnes*, 62 F.3d at 496 (holding that the numerous factors "were insufficient to provide reasonable suspicion that [the defendant] was not an innocent traveler" because it is "impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation").[5]

The seminal question, taking all the facts and circumstances as a whole, examining the facts as needed "in [an] orderly fashion," *Smith*, 263 F.3d at 291, but avoiding the error of doing so "in artificial isolation," *Cupp*, 414 U.S. at 146-47, is whether a "reasonably prudent man in the circumstances" could have believed "that his safety and that of others was in danger." *Terry*, 392 U.S. at 27. We are satisfied, as was the district court, that the combined circumstances here permitted the officers to reasonably suspect that Shank presented a danger and might have gained immediate control of a weapon if he approached the car. Shank's Fourth Amendment rights were not violated in this search, and the firearm was properly ruled admissible.

## VI.

The judgment of the district court is **AFFIRMED**.

---

[5] On occasion, a court's unmistakable obligation to review the facts in their totality seems somehow dampened. *E.g., United States v. Wood,* 106 F.3d 942 (10th Cir. 1997) (cited prominently by Appellant). The court acknowledged that the "the totality of the circumstances" must be examined, but apparently looked upon the expression of that standard as a "mantra" of questionable substance. *Id.* at 948. The court – on its way to concluding that there existed no reasonable inference of suspicion – isolated, examined and discounted each proffered fact: the defendant's statement that he had rented the car in San Francisco while the rental paper showed Sacramento; the strangeness of a travel plan that involved an unemployed painter flying with his sister to California, she returning by air and he apparently foregoing the flight, renting a car to "enjoy the scenery" while driving – speeding, actually – back to Kansas; that the rental car when stopped in Kansas was designated for return the next day in Sacramento; debris in the car indicative of a fevered and continuous cross-country trip; the defendant's "extremely nervous" and trembling appearance; and the officers' knowledge of the defendant's earlier narcotics convictions. *Id.* The court held that reasonable suspicion was not justified, explaining and dismissing in turn each fact as "innocuous," or otherwise susceptible of an innocent explanation. *Id.* (stating, for example, that "there is nothing criminal about traveling by car to view scenery;" "his [unemployment] permitted him the luxury of time [for a lengthy return];" "he may have been the donee of a wealthy relative or acquaintance;" "he might have won the lottery...."); *but cf. Smith*, 263 F.3d at 588 ("reasonable suspicion" may be present "*even if each individual factor is entirely consistent with innocent behavior* when examined separately.") (emphasis added).