NOT RECOMMENDED FOR PUBLICATION
File Name: 19a0485n.06

No. 18-2309

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Sep 17, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| AMARION AQUAI-LATROY MCELRATH, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellee. | ) | OPINION |
| | ) | |

BEFORE: BOGGS, BATCHELDER, and STRANCH, Circuit Judges.

PER CURIAM. During a night-time raid on a house suspected of drug and gun activity, the Kalamazoo police department stopped and searched Amarion McElrath. After his indictment on drug and gun charges, McElrath moved to suppress the evidence taken from him on the night of the raid. He claimed that the officers lacked a lawful basis to stop and handcuff him, so any evidence later seized was the fruit of an unlawful search. The district court agreed and suppressed the evidence. But taking all of the relevant circumstances into account, we find that the officers had reasonable suspicion to stop McElrath, and his detention and handcuffing were reasonably necessary to ensure the officers' safety. We therefore **REVERSE** the district court's suppression order.

## I.    BACKGROUND

### A. Factual Background

In February 2018, the Kalamazoo police department obtained a warrant to search 637 Florence Street, a single-family home in Kalamazoo, Michigan. Officers had received many complaints about this property in the weeks prior to the raid, including several calls of shots fired at the residence or near it. The most recent 911 call had reported shots fired at the house only two days before the raid. An informant had also identified McElrath as a crack cocaine dealer operating out of the home. An hour before the raid, officers had observed McElrath sell drugs to an informant on the sidewalk in front of the property. During the pre-raid briefing, officers were told that McElrath was possibly armed and dangerous, that informants had seen guns inside the home, and that some occupants of the house were carrying weapons.

On the night of the raid, officers approached 637 Florence from multiple directions. Most relevant here, Officers Boutell and Schemenauer came from the west and drove to the front of the house, while Officer Cake came from the southeast to secure the area behind the property. As Officers Boutell and Schemenauer approached in their vehicle, they saw two men standing by a car in a driveway next to the home. The driveway was located between 637 Florence and 635 Florence, the house next door. As it turns out, this driveway is inside the property lines of 635 Florence; but the officers testified, and McElrath does not dispute, that both the car and the two men were closer to 637 Florence, the site of the raid, when the police vehicle approached.

When the officers' vehicle came to a stop in front of 637 Florence, two things happened: the men by the car walked east, away from 637 Florence toward 635 Florence, and the parked car pulled forward, rammed the police vehicle, and sped away west along the sidewalk. At almost exactly the same time, Officers Boutell and Schemenauer exited the vehicle, raised their guns, and shouted at the men walking away to stop and get on the ground on their stomachs. By this time,

the two men had continued walking east and were near the front entrance to 635 Florence. The first of the two men, later identified as Smith,[1] immediately obeyed the officers' commands to lie down. The second man, later identified as McElrath, was slower to respond and continued for several more steps—"almost right on the border of not obeying police commands"—before stopping and lying down.

Officer Boutell attended to Smith as he lay in the snow. Meanwhile, Officer Cake approached from behind the house and found McElrath prone on the ground near Officer Boutell and Smith. Officer Cake handcuffed McElrath and asked him his name. McElrath gave his full name, but it did not yet click with Officer Cake that McElrath was the individual mentioned in the pre-raid briefing. Officer Cake asked McElrath if he had something illegal on him, and McElrath responded, "yeah." Officer Cake then asked McElrath if he had a gun, and McElrath said he did not. McElrath smelled of marijuana, and upon questioning he admitted to Officer Cake that he had just smoked marijuana before the stop. Officer Cake repeatedly asked McElrath for permission to search him, but McElrath said he would not grant permission unless he was under arrest.

Both men walked back to the police vehicles in front of 637 Florence. Officer Cake told McElrath that the police had a warrant to search people associated with 637 Florence, and at that point McElrath gave Officer Cake permission to search him. After patting him down, Officer Cake found an empty gun magazine in McElrath's pocket and some tin foil that officers associated with drug packaging material. Shortly thereafter, another officer reminded Officer Cake that McElrath was the person discussed in the pre-raid briefing. McElrath was arrested and brought back to the

---

[1] Smith's first name does not appear in the record.

police station, where an additional search revealed that he was carrying several grams of crack cocaine.

## B. Proceedings Below

The Government indicted McElrath on multiple drug and firearm charges.[2] In the district court, McElrath argued that the evidence seized from him on the night of the raid was the fruit of an unlawful search under the Fourth Amendment. He claimed that the search warrant for 637 Florence did not give police the authority to search him and that officers otherwise lacked reasonable suspicion to stop, detain, and handcuff him.

The district court agreed. The court first concluded that the search warrant did not apply to McElrath because he was inside the property lines of 635 Florence when the officers approached, and therefore he was not in the immediate vicinity of 637 Florence at the time of the stop. Next, the court decided that the officers did not have reasonable suspicion to stop McElrath because (1) the fact that the neighborhood was a high-crime area was not alone sufficient to justify the stop, (2) police were not sure if he and Smith had stopped to speak to the car in the driveway or were simply walking towards and around it, and (3) McElrath did not run away, complied with Boutell's orders, and was entirely cordial to and cooperative with Cake. Finally, the court found that the officers' decision to handcuff McElrath was unreasonable because there was no indication that he posed a risk or safety hazard to the officers. The court thus held that the search following McElrath's stop was "tainted" and suppressed the evidence seized from him during the raid.

---

[2] The firearm charge stemmed from a gun discovered after another officer saw McElrath throw something into the snow immediately before he was detained. The officer later found a gun in the snow nearby that did not have snow on it and was not cold to the touch. The officers who stopped McElrath did not know or suspect that he had thrown the gun into the snow at the time of the stop. Because this gun was not seized from McElrath during the search, the district court did not suppress it.

The Government now appeals the district court's suppression order. Although in the district court it raised a number of alternative theories to support McElrath's search, on appeal it makes only one claim: that officers had reasonable suspicion to stop, detain, and handcuff McElrath, and that his later admission to having illegal contraband—coupled with the officers' recognition that he was the subject of a previous controlled drug buy—justified the arrest and search that followed. For his part, McElrath does not dispute that officers had probable cause to search him after he admitted that he had something illegal on him. He argues only that officers lacked reasonable suspicion to stop and detain him in the first place.

## II.    ANALYSIS

### A.  Standard of Review

On appeal of a suppression order, "this court reviews the district court's factual findings for clear error and its legal conclusions *de novo*." *United States v. McCraney*, 674 F.3d 614, 616 (6th Cir. 2012). While "the ultimate reasonable suspicion inquiry is *de novo*," we give "due weight" to the inferences drawn by the district court because it is "at an institutional advantage, having observed the testimony of the witnesses and understanding local conditions, in making this determination." *United States v. Foster*, 376 F.3d 577, 583 (6th Cir. 2004) (citation and internal quotation marks omitted).

### B.  The Reasonableness of the Stop

An officer may briefly stop a person for investigatory purposes if, "under the totality of the circumstances," he has a "reasonable suspicion" to do so. *Brown v. Lewis*, 779 F.3d 401, 412 (6th Cir. 2015) (citation and internal quotation marks omitted). A reasonable suspicion is one "based on specific and articulable facts" that support "a particularized and objective basis for suspecting the particular person . . . of criminal activity." *Id.* (citation and internal quotation marks omitted).

Because this is an objective test, "the officers' actual subjective motivations in effectuating the stop are irrelevant to the validity of the stop." *United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008). At bottom, our "determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).

The reasonableness of the stop here turns on a threshold question: did the officers have a "particularized and objective basis" for suspecting that McElrath[3] was involved in drug activity and/or gun violence when they stopped him? To answer this question, several facts are most relevant. First, the officers who stopped McElrath were aware of many recent complaints about drug activity and shots fired at 637 Florence, including a report of shots fired on the property only two days before the raid. Second, these officers also knew that, just an hour before the raid, police had observed McElrath sell drugs to an informant on the sidewalk in front of the home. Third, as they approached the property, the officers saw two men standing by a car in the driveway directly next to 637 Florence—only a few steps from where McElrath had sold drugs to an informant the hour before. Fourth, as the officers' vehicle came to a stop outside the home, these two men walked away from the property, and the car next to them pulled forward, hit the officers' vehicle, and sped away along the sidewalk in the opposite direction.

While none of these events may have been sufficient in isolation, they must be considered in combination. The totality of the circumstances here—the numerous complaints about drug activity at the house, the reports of shots fired on the property two days before, McElrath's location steps away from the site of an hour-old controlled drug buy, his decision to walk away as officers approached, and the nearby car's reckless flight as McElrath left the scene—were enough to give

---

[3] We refer to McElrath by name to avoid confusion, but the officers did not know that the man they stopped at the time was McElrath until after his stop and detention.

officers a reasonable basis to suspect that he was involved in criminal activity. *See*, *e.g.*, *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012) ("In considering the totality of the circumstances, we must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." (citation and internal quotation marks omitted)); *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006) ("While reasonable suspicion must be based on more than 'ill-defined hunches,' officers may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002))).

McElrath tries to counter the evidence in a few ways, none of which is persuasive. He first claims that the most important fact in this case is that the officers decided to detain him on the strength of the search warrant, not because of any reasonable suspicion. The district court reached a different conclusion, finding as a matter of fact that Boutell did not stop McElrath in order to preserve the premises of the search or evidence found during the lawful search, or to protect anyone, but did so only because he thought McElrath was possibly involved in a crime. McElrath has not argued that the district court's factual finding was clearly erroneous, and we find no basis for doing so. Regardless, because the subjective motivations of officers are irrelevant in this context, *see Shank*, 543 F.3d at 313, this disagreement is also irrelevant.

Next, McElrath emphasizes that an individual's presence in a so-called "high crime" area is not enough to provide reasonable suspicion. It is true that presence in a high-crime neighborhood—or even general proximity to the site of suspected criminal activity—is not alone sufficient to justify a stop. *See, e.g.*, *id.* at 316 n.3 (cautioning "that high-crime area designations

not be permitted to serve as a proxy for race or ethnicity" (citation and internal quotation marks omitted)); *King v. United States*, 917 F.3d 409, 424 (6th Cir. 2019) (deciding officers lacked reasonable suspicion to stop suspect who "was several blocks away from the relevant intersection"). But that is not what happened here. McElrath was not simply walking in a high-crime neighborhood when officers saw him, nor was he merely in the general proximity of 637 Florence. Instead, he was steps away from both the target house and the location of the recent controlled drug buy. McElrath's close proximity to this circumscribed area—where specific criminal activity had occurred only an hour before—reasonably contributed to the officers' suspicion. *See, e.g.*, *United States v. Caruthers*, 458 F.3d 459, 468 (6th Cir. 2006), *abrogated on other grounds by Cradler v. United States*, 891 F.3d 659 (6th Cir. 2018) (finding facts supported reasonable suspicion where "the 'high-crime' area [wa]s circumscribed to a specific intersection rather than an entire neighborhood" and "the crimes that frequently occur[ed] in the area [we]re specific and related to the reason for which [the defendant] was stopped").

McElrath likewise maintains that walking away from the police does not by itself create reasonable suspicion. That is also true. In *United States v. Beauchamp*, we held that "hurriedly walking away from an officer without making eye contact . . . does not rise to the level of independent suspicion" necessary to support a *Terry* stop. 659 F.3d 560, 570 (6th Cir. 2011). But while the court found that such behavior does not "rise to the level of *independent* suspicion," it also recognized that walking away from police may "contribute to reasonable suspicion" if *combined* with "specific facts [showing] that the defendant's behavior was otherwise suspicious." *Id.* (emphasis added). The other "specific facts" in this case—McElrath's direct proximity to the target house, his location very near a recent drug buy, and his suspected association with the car

that dangerously fled as soon as police arrived—were enough to make McElrath's behavior "otherwise suspicious." *Id.*

McElrath also makes much of the fact that the driveway between 637 Florence and 635 Florence is inside the property lines of 635 Florence. But the reasonable-suspicion inquiry recognizes only "the information available to law enforcement officials at the time." *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012). The property line between 637 Florence and 635 Florence was not known to the officers when they stopped McElrath. If the observable *characteristics* of the driveway had made clear that it belonged to 635 Florence, that would be relevant to our analysis. But the photos in the record confirm that the driveway is roughly equidistant from both houses, and nothing about the driveway's appearance otherwise indicates that it belongs to one house or the other. In fact, Officers Boutell and Schemenauer both testified that the parked car and McElrath were closer to 637 Florence than to 635 Florence when they approached the scene—so close that Officer Schemenauer thought McElrath appeared to be in the front yard of 637 Florence. These facts, in combination with the others discussed above, were enough to support a reasonable suspicion of criminal activity.

Finally, McElrath claims that the car in the driveway fled down the sidewalk only *after* the officers ordered him to stop. The bodycam footage in the record does not clearly show whether the car began moving before, after, or concurrent with the officers' commands. The district court's findings of fact suggest that the car began moving before those commands, and given the uncertainty in the record, we cannot say this finding was clearly erroneous. At any rate, the reasonable-suspicion inquiry does not begin until a person is "seized" within the meaning of the Fourth Amendment. A suspect is not seized until he "submit[s] to [the officers'] show of authority," even if the officers have their guns drawn before the suspect submits. *Robinson v.*

*Howes*, 663 F.3d 819, 828 (6th Cir. 2011). Here, the parties have not disputed—and the bodycam footage appears to confirm—that McElrath stopped walking and lay on the ground only after the car had already begun speeding away. The car's flight therefore reasonably contributed to the officers' suspicion at the time of the stop.

## C. The Manner of the Intrusion

The final question is whether "the degree of intrusion into [McElrath's] personal security was reasonably related in scope to the situation at hand." *Smoak v. Hall*, 460 F.3d 768, 779 (6th Cir. 2006). If "the length and manner" of the stop, including the officers' show of force, were not "reasonably related to the basis for the initial intrusion," then the stop ripened into an arrest for which the officers needed probable cause. *Houston v. Clark County Sheriff Deputy John Does 1–5*, 174 F.3d 809, 814 (6th Cir. 1999). McElrath does not claim here that the length of his detention was unreasonable; he argues only that the manner of his detention was unreasonably intrusive.

Where, as here, officers use a militarized police presence[4] in the course of a stop, we pay close attention to the question of whether the suspect's detention was reasonably related to the original basis for the stop. At the same time, "the use of guns, handcuffs, and detention . . . do[es] not automatically transform a *Terry* stop into an arrest"; rather, the officers' "displays of force must be warranted by the circumstances." *Brown*, 779 F.3d at 415. Such "intrusive measures are warranted" if, for example, "specific facts lead to an inference" that the suspect poses a risk "of violence to the officers." *Id.* These "specific facts" can include information supporting "a reasonable belief that the suspect is armed and dangerous." *Bennett v. City of Eastpointe*, 410 F.3d 810, 835 (6th Cir. 2005).

---

[4] The raid included 19 heavily armed and armored officers, a tactical minivan, and a militarized SWAT vehicle.

At the time of the raid, the officers knew that McElrath was likely on the property, that he was possibly armed and dangerous, that police had received many recent complaints about drug activity and shots fired on the premises (including shots fired only two days before), that informants had seen guns inside the home, and that some occupants of the house were carrying weapons. And when officers approached the house, they immediately encountered a car that hit their vehicle and dangerously fled the scene. Knowing all of these facts, the officers made a reasonable decision to protect themselves by raising their guns and handcuffing suspects who appeared to be associated with the property. *See, e.g.*, *Brown*, 779 F.3d at 415 ("The details of the suspected crime may also provide the specific facts justifying an inference of dangerousness.").

### III.    CONCLUSION

The officers had reasonable suspicion to stop McElrath, and his detention and handcuffing were reasonably necessary to ensure the officers' safety. Because the stop and detention were reasonable, the evidence later taken from McElrath was admissible. We therefore **REVERSE** the district court's suppression order.