**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0128n.06

**No. 19-3021**

| | | |
|---|---|---|
| **UNITED STATES COURT OF APPEALS**<br>**FOR THE SIXTH CIRCUIT** | | **FILED**<br>Mar 03, 2020<br>DEBORAH S. HUNT, Clerk |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE |
| | ) | NORTHERN DISTRICT OF |
| MICHAEL PEDICINI, | ) | OHIO |
| | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |

**BEFORE:** **GRIFFIN, STRANCH, and DONALD, Circuit Judges.**

**JANE B. STRANCH, Circuit Judge.** Michael Pedicini appeals the district court's denial of his motion to suppress evidence that was discovered when Highway Patrol Trooper Austin Skipper pulled over his vehicle for an alleged traffic violation and conducted a pat-down search of his person. Because Pedicini did not unequivocally consent to the search and Trooper Skipper lacked reasonable suspicion to conduct a lawful pat-down, we **REVERSE** the court's judgment.

On November 26, 2017, Pedicini was driving a Toyota rental vehicle northbound on West 41st Street when he passed Trooper Skipper's patrol vehicle. Trooper Skipper explained that he was parked perpendicular to the street Pedicini was driving on and, after Pedicini passed his vehicle, he noticed Pedicini swerve approximately half a car width over the marked-lane line into the bicycle lane. Concluding that Pedicini had committed a traffic violation, Trooper Skipper pulled onto West 41st Street, turned on his sirens, and pulled Pedicini over.

Trooper Skipper approached Pedicini's driver-side window, requested his driver's license, and asked a number of background questions. Pedicini told the Trooper he had a prior felony conviction for trafficking cocaine and that he was driving a rental vehicle because his personal car had engine problems. Pedicini also commented that he was wearing two pairs of pants because he was coming from work, which Trooper Skipper thought strange. As Pedicini handed over his paperwork his fingers trembled, and the Trooper noticed that Pedicini kept rubbing his fingertips together.

Trooper Skipper asked Pedicini to step out of his vehicle and to come with him to the back of the car, in front of the cruiser, to go over Pedicini's license and a "couple more things." The Trooper told him that if everything checked out he would be free to go, to which Pedicini replied "alright." He asked Pedicini if he had any citations recently and Pedicini responded that he had not, and then, seemingly confused, asked "so you want me to come with you?" After the Trooper affirmed, Pedicini asked if he was under arrest. Trooper Skipper explained that Pedicini was not under arrest and said he just wanted to "talk to [him] about a few things." Pedicini stepped out of the vehicle and the Trooper walked him to the front of his patrol car directly before the dash camera while asking Pedicini if he had any weapons on him. The video footage shows no clear verbal or physical response to this question, but it appears Pedicini slightly shook his head no. Trooper Skipper asked Pedicini if he could conduct a pat-down search for weapons, but Pedicini verbally did not answer this question either; instead, while Pedicini slightly extended his arms he asked both why he was being patted-down and if he was in trouble. Trooper Skipper, speaking rapidly throughout the exchange, responded that he was patting Pedicini down for weapons, asked him again if he could pat him down, while continuing to question Pedicini about whether he possessed any objects that could injure the Trooper and then listing what those objects might be. Pedicini

subtly nodded, but to what exactly is unclear. The Trooper proceeded to pat-down Pedicini, which led to the discovery of a handgun in Pedicini's groin area. He handcuffed Pedicini, and then read him his *Miranda* rights. Trooper Skipper ultimately let Pedicini go with a verbal warning for the marked-lane violation.

On January 4, 2018, a grand jury charged Pedicini with one count of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). Pedicini moved to suppress the loaded firearm. The district court held an evidentiary hearing at which Trooper Skipper, Pedicini, and Henry Lipian, Pedicini's expert, testified; the court denied the motion. Pedicini later pled guilty, reserving his right to appeal the denial of his motion to suppress. The court sentenced Pedicini to 100 months' imprisonment, and Pedicini timely appealed.

Pedicini challenges the district court's denial of his motion to suppress. We review the district court's legal conclusions de novo and its findings of fact for clear error, viewing the evidence in the light most favorable to the government. *See United States v. Ellis*, 497 F.3d 606, 611 (6th Cir. 2007).

Pedicini argues that Trooper Skipper did not have probable cause to initiate the traffic stop for a marked-lane violation. A traffic stop is unconstitutional unless it is supported by probable cause that a traffic violation occurred or by reasonable suspicion of ongoing criminal activity. *United States v. Campbell*, 549 F.3d 364, 370 (6th Cir. 2008). Courts review "the totality of the circumstances" when assessing the validity of a stop. *United States v. Roberts*, 986 F.2d 1026, 1029 (6th Cir. 1993) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). Pedicini emphasizes that the dash camera did not capture the marked-lane violation, which the Government concedes. Trooper Skipper testified, however, that his vehicle was parked perpendicular to the roadway and because the dash camera only faces forward, it could not capture and record the traffic

violation that Trooper Skipper said he witnessed. The district court determined that there was probable cause for the traffic violation based on Trooper Skipper's testimony.

Pedicini argues that Trooper Skipper's testimony is improbable and inconsistent. His expert, Lipian, testified that the dash camera showed it would be impossible to determine whether Pedicini committed a traffic infraction from Trooper Skipper's vantage point. But upon clarification that Trooper Skipper's vehicle was perpendicular to Pedicini's vehicle as it drove by, Lipian ultimately agreed that the Trooper likely would have been able to see the infraction. Pedicini alleges inconsistencies, pointing out that Trooper Skipper wrote in his report, "[i]immediately after [Pedicini] passed me he traveled over the solid white lane line on the eastside of the roadway," but during the suppression hearing, Trooper Skipper testified that the infraction occurred approximately four to five houses past where he parked his car. Pedicini also asserts that Trooper Skipper told him the day of the incident that he had been "bobbing" the line, which implies committing multiple marked-lane violations, but then during the hearing testified that he saw Pedicini cross the marked-lane only once. The district court found that these minor inconsistencies do not discredit Trooper Skipper's testimony. Because the inconsistencies are slight, the court's finding does not rise to clear error. Construing the evidence in the Government's favor, it was not error to conclude that Trooper Skipper had probable cause to pull Pedicini over.

Pedicini next contends that he did not voluntarily consent to step out of the vehicle and to a pat-down search of his person. Whether consent was voluntary is a question of fact to be determined based on the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973). Non-verbal actions can constitute consent, but they must be clear and "will not be found upon mere 'acquiescence to a claim of lawful authority.'" *United States v. Carter*, 378 F.3d 584, 589 (6th Cir. 2004) (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968)).

Pedicini's consent must have been "unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion." *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (quoting *United States v. Tillman*, 963 F.2d 137, 143 (6th Cir. 1992)). To determine whether this standard is met, we consider the length and nature of the detention, *Bustamonte*, 412 U.S. at 226; coercive conduct by the police, *id.*; and any indications of "more subtle forms of coercion that might flaw [an individual's] judgment," *United States v. Watson*, 423 U.S. 411, 424 (1976). Because voluntariness is a question of fact, the "district court's finding of voluntary consent will be reversed only if clearly erroneous." *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998).

Trooper Skipper's dash camera shows that he asked Pedicini to step out of his car, which led Pedicini to question what was happening by asking if he was under arrest. The Trooper told Pedicini that he was not under arrest and that he just wanted to talk to him and then would let him go free. Pedicini stepped out of the vehicle and followed the Trooper to the front of his cruiser where the officer asked Pedicini if he had any weapons on him. Trooper Skipper, speaking rapidly throughout the exchange, then asked Pedicini if he would mind a pat-down of his person, but Pedicini did not give a verbal response. Instead, while slightly extending his arms, he asked both why he was being patted-down and if he was in trouble. The Trooper explained that he wanted to search Pedicini for weapons, asked him if he would mind the pat-down search and if Pedicini had any weapons that could injure him during the pat-down. Without allowing Pedicini a chance to respond, he proceeded to list potential sharp items. It was only following this series of questions that Pedicini slightly nodded his head, perhaps in response to Trooper Skipper's first question, perhaps to the second, or perhaps just a nod in acknowledgment of the Trooper's list of various dangerous objects. What is clear from this exchange is Pedicini's consistent confusion and reluctance to be searched as indicated by his repeated questions even while acquiescing to the

Trooper. Based on the totality of the circumstances, Pedicini's non-verbal actions were not unequivocal, specific, and intelligently undertaken; they did not constitute voluntary consent. *See Worley*, 193 F.3d at 386. The district court's contrary finding was clearly erroneous.

Because we find that Pedicini did not consent to the pat-down search, we consider next whether Trooper Skipper had reasonable suspicion to conduct the search. An officer may perform a pat-down "only upon reasonable suspicion that they may be armed and dangerous." *United States v. Noble*, 762 F.3d 509, 521 (6th Cir. 2014) (brackets omitted) (quoting *Knowles v. Iowa*, 525 U.S. 113, 118 (1998)). Reasonable suspicion exists if "a reasonably prudent [person] in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry v. Ohio*, 392 U.S. 1, 27 (1968). This is an objective standard. *Id.* at 22. Reasonable suspicion "requires more than a mere hunch." *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012) (quoting *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008)). "It demands 'a particularized and objective basis for suspecting [that] the particular person' is armed and dangerous." *Noble*, 762 F.3d at 522 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)) (alteration in original).

The Government argues that Trooper Skipper had reasonable suspicion to conduct the pat-down for the following reasons: (1) Pedicini's nervousness (his rigid driving posture, hands trembling while handling the paperwork, rubbing his fingertips together, and comment that he was wearing two pairs of pants because he had just come from work); (2) Pedicini driving a rental vehicle with an out an out-of-state license; (3) the infraction occurring in a high crime area; and (4) Pedicini admitting that he had prior felony charges for drug trafficking. Each will be discussed separately before considering them all together.

We have repeatedly held that "nervousness—even extreme nervousness—'is an unreliable indicator' of someone's dangerousness, 'especially in the context of a traffic stop.'" *Id.* at 522

(quoting *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004)) (collecting cases). It is not uncommon for an individual to "become nervous during a traffic stop, even when they have nothing to hide or fear." *United States v. Richardson*, 385 F.3d 625, 630–31 (6th Cir. 2004). Thus, "while part of the reasonable suspicion analysis," these signs of nervousness "are given little weight." *United States v. Johnson*, 482 F. App'x 137, 145 (6th Cir. 2012).

Driving a rental vehicle can be a relevant consideration in certain contexts, such as if the vehicle is weeks overdue, *United States v. Branch*, 537 F.3d 582, 588 (6th Cir. 2008), or being driven by someone who is not authorized to drive it, *United States v. Winters*, 782 F.3d 289, 298–300 (6th Cir. 2015). But that is not the case here; Pedicini was authorized to drive the rental vehicle and provided a valid rental car agreement upon request. Pedicini also offered a valid reason for driving a rental vehicle: that his own vehicle had engine problems. The fact that Pedicini was lawfully driving a rental vehicle, by itself, adds no weight to the reasonable suspicion determination.

Being in a high crime area is a relevant consideration in a reasonable suspicion analysis, but this consideration is not absolute. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."). The consideration here is further cabined by the fact that Pedicini merely drove through the area rather than conducted any specific activity therein. The dash camera showed that Pedicini was driving on a main thoroughfare when Trooper Skipper turned on his siren. Many people who have no involvement in criminal activity commute on thoroughfares that pass through high crime areas. This case, moreover, differs from cases like *Wardlaw* where the defendant was standing next to a

building with a suspicious bag in his hand in a high crime area. *Id.* at 121–22. Pedicini's driven path through a high crime area is due minimal weight.

Knowledge of a prior felony is also a relevant consideration in a reasonable suspicion analysis. *See United States v. Stepp*, 680 F.3d 651, 667 (6th Cir. 2012). Pedicini's admission of his record, in isolation or with minimal help from other factors, is not enough to support a reasonable suspicion determination. *See Noble*, 762 F.3d at 524 (emphasizing that "we have always required some corroboration that particular individuals are involved in dealing drugs before allowing a frisk for weapons" (citation omitted)); *Joshua v. DeWitt*, 341 F.3d 430, 446 (6th Cir. 2003) (holding that knowledge of a defendant's criminal history, when combined with other minimal factors such as nervousness and illogical travels was insufficient to establish reasonable suspicion).

Absent from the Government's specified reasons for reasonable suspicion are the contexts that would lend any weight to those reasons, which render them of minimal value. As we have previously held,

> even where the government points to several factors that this court has 'recognized as valid considerations in forming reasonable suspicion,' they may not together provide reasonable suspicion if 'they are all relatively minor and subject to significant qualification,' particularly where the case lacks any of the stronger indicators of criminal conduct that have accompanied these minor factors in other cases.

*United States v. Bell*, 555 F.3d 535, 540 (6th Cir. 2009). Based on the totality of the circumstances, a reasonably prudent person would not have believed that his safety or that of others was in danger. *Terry*, 392 U.S. at 27. Trooper Skipper lacked reasonable suspicion to conduct the pat-down search.

For the foregoing reasons, we **REVERSE** the district court's judgment.

GRIFFIN, Circuit Judge, dissenting.

I agree with the majority opinion that Trooper Austin Skipper possessed probable cause to conduct the traffic stop of defendant Michael Pedicini's vehicle, and that the district court clearly erred in ruling that Pedicini consented to the search of his person. However, I disagree with the majority's holding that a reasonable officer in Skipper's position would not have reasonable suspicion to believe that Pedicini "might be armed and presently dangerous." *Pennsylvania v. Mimms*, 434 U.S. 106, 112 (1977). I therefore respectfully dissent.

Reasonable suspicion is not a demanding standard. It "requires more than just a 'mere hunch,' but is satisfied by a likelihood of criminal activity less than probable cause, and 'falls considerably short of satisfying a preponderance of the evidence standard.'" *Smoak v. Hall*, 460 F.3d 768, 778 (6th Cir. 2006) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). An officer simply must have a "particularized and objective basis for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273 (citation and internal quotation marks omitted).

We look at the totality of the circumstances to determine whether an officer had reasonable suspicion to perform a patdown for weapons. *Id.* This requires "determin[ing] whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001). "Pertinent circumstances include the officer's own direct observations, dispatch information, directions from other officers, and the nature of the area and time of day during which the suspicious activity occurred." *United States v. Campbell*, 549 F.3d 364, 371 (6th Cir. 2008). We also "must bear[ ] in mind that officers are permitted 'to draw on their own experience and specialized training to make inferences from and deductions about the

cumulative information available to them.'" *Green v. Throckmorton*, 681 F.3d 853, 860 (6th Cir. 2012) (quoting *United States v. Ellis*, 497 F.3d 606, 613 (2007)).

In *Arizona v. Johnson*, 555 U.S. 323 (2009), the Supreme Court recognized the inherent dangers to police officers who conduct traffic stops:

> "[M]ost traffic stops," this Court has observed, "resemble, in duration and atmosphere, the kind of brief detention authorized in *Terry*." *Berkemer v. McCarty*, 468 U.S. 420, 439, n. 29 (1984). Furthermore, the Court has recognized that traffic stops are "especially fraught with danger to police officers." *Michigan v. Long*, 463 U.S. 1032, 1047 (1983). "'The risk of harm to both the police and the occupants [of a stopped vehicle] is minimized,'" we have stressed, "'if the officers routinely exercise unquestioned command of the situation.'" *Maryland v. Wilson*, 519 U.S. 408, 414 (1997) (quoting *Michigan v. Summers*, 452 U.S. 692, 702–703 (1981)); see *Brendlin*, 551 U.S., at 258. Three decisions cumulatively portray *Terry*'s application in a traffic-stop setting: *Pennsylvania v. Mimms*, 434 U.S. 106 (1977) *(per curiam)*; *Maryland v. Wilson*, 519 U.S. 408 (1997); and *Brendlin v. California*, 551 U.S. 249 (2007).
>
> In *Mimms*, the Court held that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." 434 U.S., at 111, n. 6. The government's "legitimate and weighty" interest in officer safety, the Court said, outweighs the "*de minimis*" additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle. *Id*., at 110–111. Citing *Terry* as controlling, the Court further held that a driver, once outside the stopped vehicle, may be patted down for weapons if the officer reasonably concludes that the driver "might be armed and presently dangerous." 434 U.S., at 112.

*Id.* at 330–31 (parallel citations omitted).

Thus, a patdown search is not an unreasonable search and seizure proscribed by the Fourth Amendment if a reasonable officer reasonably believes that the detainee "might be armed and presently dangerous." In my view, the totality of the circumstances supports a finding of reasonable suspicion sufficient to justify the patdown search of Pedicini for Trooper Skipper's safety. Pedicini admitted that he had previously been convicted of drug-trafficking offenses. Trooper Skipper testified that, based on his experience and training, drug traffickers are frequently

armed. *See, e.g.*, *United States v. Adkins*, 429 F. App'x 471, 478 (6th Cir. 2011) ("[D]rug traffickers generally use firearms to protect their drugs and money during drug transactions."); *United States v. Hardy*, 643 F.3d 143, 147 (6th Cir. 2011) ("[A detective] told the jury that drug traffickers typically possess firearms to protect the drugs, their money, and themselves."); *United States v. Martin*, 210 F.3d 373, 2000 WL 353538, at \*2 (6th Cir. 2000) (table) (At trial, the government presented evidence that . . . drug traffickers carry firearms to protect themselves, their drugs, and the proceeds of drug transactions.").

In addition, Pedicini's presence in a high-crime area, in the dark, in a rental car, all provide tangible support for Trooper Skipper's suspicion that Pedicini might be armed.

Moreover, Pedicini was unusually nervous. His nervousness was pervasive and manifested itself in several odd behaviors. The very first thing Pedicini told Trooper Skipper when he approached the driver's side window was "I got two pairs of pants on 'cause I was working." This was suspicious and, without delving into what professions require wearing two pairs of pants at the same time, was an odd way to start a conversation with a police officer during a traffic stop.

Skipper had previously noticed Pedicini sitting rigidly in his seat and avoiding eye contact. His shaking hands, fumbling with his paperwork, and constant rubbing together of his fingertips together also showed how nervous he was. Skipper testified at the suppression hearing that "[e]veryone becomes a certain level of nervous" during a traffic stop. "It changes when they have an abnormal abundance of nervousness to them." That's what happened here; Pedicini's behavior indicated *extreme* nervousness and apprehension, out of the ordinary to a police officer who deals every day with drivers unnerved by his presence. *See United States v. Shank*, 543 F.3d 309, 317 (6th Cir. 2008). Skipper's experience and training tipped him off—correctly—that something was amiss.

The majority opinion mistakenly views these factors "taken in artificial isolation." *Id.* But, in my view, "taken as a whole," they meet its low bar of reasonable suspicion. *Id.* at 315. I would affirm the district court's denial of Pedicini's motion to suppress and, therefore, respectfully dissent.